IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **MICHAEL VILLEGAS, et al** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. H-07-02165** |
| | § | |
| **DEPENDABLE CONSTRUCTION** | § | |
| **SERVICES. INC., et al** | § | |
| | § | |
| *Defendants.* | § | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

I.    NATURE OF THE CASE ........................................................................... 1

II.   FACTS ...................................................................................................... 1

      A. General Background........................................................................... 1

      B. Facts About Each Plaintiff ................................................................ 6

            1. Michael Villegas ...................................................................... 6

            2. Kent Nudell .............................................................................. 7

            3. William Barlow...................................................................... 10

            4. Bill Parsons............................................................................ 13

            5. Robert Beltran........................................................................ 15

            6. John Beltran ........................................................................... 17

            7. Carl Beltz .............................................................................. 18

            8. David Garcia .......................................................................... 19

            9. Jesse Gutierrez ...................................................................... 20

III.  STANDARD OF REVIEW .................................................................... 20

IV.   SUMMARY JUDGMENT IS REQUIRED........................................... 22

      A.    Plaintiff Barlow's FLSA Claim Is Partially Barred By Limitations ..................... 22

      B.    Plaintiffs Barlow, Nudell, And Robert Beltran Were Executive Employees
            And Therefore Exempt From Overtime.............................................. 24

            1.    Plaintiffs Barlow, Nudell, and Robert Beltran were paid on a salary
                  basis at a rate of not less than $455 per week ........................... 25

            2.    Plaintiffs Barlow, Nudell, and Robert Beltran held a position the
                  primary duty of which was to maintain a recognized department or
                  subdivision ............................................................................. 25

            3.    Plaintiffs Barlow, Nudell, and Robert Beltran customarily and
                  regularly directed the work of two or more other employees ................. 27

            4.    Plaintiffs Barlow, Nudell, and Robert Beltran possessed such status
                  that their suggestions and recommendations as to the hiring, firing,
                  advancement, promotion or any other change of status of other
                  employees was given particular weight .................................... 28

      C.    Plaintiffs Were Administrative Employees And Therefore Exempt From
            Overtime .......................................................................................... 30

**TABLE OF CONTENTS**
(continued)

Page

|  | 1. | Plaintiffs were paid on a salary basis at a rate of not less than $455 per week | 30 |
|  | 2. | Plaintiffs had a primary duty that included the performance of non-manual work directly related to the management or general business operations of DCS or DCS's customers | 30 |
|  | 3. | Plaintiffs had a primary duty that included the exercise of discretion and independent judgment with respect to matters of significance | 32 |
|  | 4. | Plaintiffs also meet the primary duty requirement for the administrative exemption because of the combination exemption | 35 |
| D. | | Plaintiffs Were Covered By The Motor Carrier Act And Therefore Exempt From Overtime | 36 |
| E. | | Defendants Never Willfully Denied Plaintiffs Any Alleged Overtime | 38 |
| F. | | Plaintiffs' Claims Must Be Dismissed Because They Have Not Engaged in Discovery And Have Not Abided By This Court's Order | 39 |
| V. | | CONCLUSION AND PRAYER | 41 |

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505 (1986) ............................2

*Anderson v. Timber Prods. Inspection, Inc.*, 334 F. Supp. 2d 1258 (D. Or. 2004) ..........37

*Cash v. Cycle Craft Company, Inc.*, 482 F. Supp. 2d 133 (D. Mass. 2007) ....................31

*Celotex v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986) ...........................................21, 22

*Conkling v. Turner*, 18 F.3d 1285 (5th Cir. 1994).............................................................22

*Edwards v. Alta Colleges, Inc.*, No. SA-03-CA-0538 *OG (NN)*, 2005 U.S. Dist. LEXIS 3753 (W.D. Tex. Feb. 28, 2005)................................................................23, 38

*Ferrell v. Gwinnett County Bd. Of Educ.*, 481 F. Supp. 2d 1338 (N.D. Ga. 2007) ..........33

*Freidrich v. U.S. Computer Services*, 974 F.2d 409 (3d Cir. 1992) ................................37

*Hickman v. Fox Television Station, Inc.*, 231 F.R.D. 248 (S.D. Tex. 2005) ....................39

*IntraComm, Inc. v. Bajaj*, 492 F.3d 285 (4th Cir. 2007) ..................................................33

*Jones v. ENSR Corporation*, 1997 U.S. App. LEXIS 16404 (6th Cir. July 1, 1997) ........................................................................................................................25, 29

*Leonard v. Dixie Well Serv. & Supply, Inc.*, 828 F.2d 291 (5th Cir. 1987) ......................22

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) .............................................21, 22

*Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326 (5th Cir. 2000) .........24, 30

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348 (1986)...............................................................................................................21, 22

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 108 S. Ct. 1677 (1988).................22, 23

*Orr v. James D. Julia, Inc.*, 2008 U.S. Dist. LEXIS 49687 (D. Maine June 27, 2008) ....................................................................................................................31

*Posely v. Eckerd Corp.*, 433 F. Supp. 2d 1287 (S.D. Fla. 2006) ....................................27

*Reyes v. Texas EZPawn, L.P.*, 459 F. Supp. 2d 546 (S.D. Tex. 2006) ........................22, 23

**TABLE OF AUTHORITIES**
(continued)

Page

*Saunders v. Michelin Tire*, 942 F.2d 299 (5th Cir. 1991).....................................................22

*Scott v. Farouk Systems, Inc.*, 2007 U.S. Dist. LEXIS 57693 (S.D. Tex. Aug. 8, 2007) .........................................................................................................................24, 39

*Sinclair v. Beacon Gasoline Co.*, 447 F. Supp. 5 (W.D. La. 1976) ...................................37

*State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116 (5th Cir. 1990)...............................22

*Wilson v. Rentway Inc.*, 2004 U.S. Dist LEXIS 2086 (N.D. Tex. Feb. 11, 2004) ............41

## TABLE OF AUTHORITIES
(continued)

Page

### STATUTES

29 U.S.C. § 213(b)(1) ...................................................................................................35
49 U.S.C. § 13102(15) ..................................................................................................36
49 U.S.C. § 31501(1)(A) ...............................................................................................36
49 U.S.C. § 31502(b)(2) ...............................................................................................36
SAFETEA-LU Technical Corrections Act of 2008, Pub. L. No. 110-244, § 306,
   122 Stat. 1572, 1620 (2008) ....................................................................................38

### REGULATIONS

5 C.F.R. § 551.206(i) ...................................................................................................31
29 C.F.R. § 541.100.....................................................................................................24
29 C.F.R. § 541.102.....................................................................................................26
29 C.F.R. § 541.105 .....................................................................................................28
29 C.F.R. § 541.106(a)..................................................................................................26
29 C.F.R. § 541.200......................................................................................................30, 32
29 C.F.R. § 541.202(b) .................................................................................................32
29 C.F.R. § 541.202(c) ..................................................................................................33
29 C.F.R. § 541.202(d) .................................................................................................30
29 C.F.R. § 541.203(c)...................................................................................................13, 15
29 C.F.R. § 541.708......................................................................................................16
Pay Administration Under the Fair Labor Standards Act, 72 Fed. Reg. 52753,
   52755 (Sept. 17, 2007) (to be codified at 5 C.F.R. pt. 551).........................................31
69 Fed. Reg. 22, 143 ....................................................................................................33

### MISCELLANEOUS

Daniel B. Abrahams, et. al., Employer's Guide to the Fair Labor Standards Act, p.
   153.............................................................................................................................32, 33

Fed. R. Civ. P. 37........................................................................................................39

Fed. R. Civ. P. 56........................................................................................................20, 21

Wage and Hour Opinion Letter (FLSA2007-3) (Jan. 25, 2007) ............................24, 25, 26

Wage and Hour Opinion Letter (FLSA2005-27) (Aug. 26, 2005).....................................36

## I.     NATURE OF THE CASE

This is a wage and hour case consisting of nine plaintiffs, most of whom worked for less than four months and one of whom only worked for three weeks. Plaintiffs Michael Villegas ("Villegas"); Kent Nudell ("Nudell"); William Barlow ("Barlow"); William Parsons ("Parsons"); Robert Beltran; John Beltran; Carl Beltz ("Beltz"); David Garcia ("Garcia"); and Jesse Gutierrez ("Gutierrez"), (hereinafter collectively referred to as "Plaintiffs"), contend they should have been paid overtime in those weeks in which they worked more than 40 hours for Defendant Dependable Construction Services, Inc. ("DCS"). DCS is a company that consistently pays overtime to nonexempt-hourly employees. However, Plaintiffs' job descriptions, timesheets, expense reports, field reports and individual deposition testimony establish that they were exempt from the overtime provisions of the Fair Labor Standards Act ("FLSA") through its executive, administrative, and Motor Carrier Act exemptions. Therefore, Defendants are entitled to summary judgment on all of Plaintiffs' overtime claims.

## II.    FACTS

### A.     General Background

Dependable Construction Services ("DCS") is a full-service nationwide general contractor located in Spring, Texas. The Company specializes in expansions, renovations, ground-up construction, store fixtures, roll-outs, tenant build-outs, construction management, disaster recovery, and previously occupied building conversions. *See Affidavit of Gregg Gregoire attached hereto as Exhibit "T" at 1 ("T-1").* Some of DCS's customers include Dollar Tree, Hibbett Sports, Sears, Panera Bread, Target, Bealls, Palais Royal, Marshalls, TJ Maxx, Payless Shoe Stores, Scooter Stores and Kmart. *T-1.*

The construction projects DCS manages are very complex and require on-site supervision and coordination to ensure that they are completed on time and on budget. *T-1*. Every project requires a Superintendent to supervise and direct DCS employees, carpenters, electricians, and other laborers.[1] A Superintendent's responsibilities include filling out a daily report that lists the duties of each person working on the project according to job category. The Foreman carries out the duties of the Superintendent when the Superintendent is not available. *See Deposition of Kent Nudell attached hereto as Exhibit "B" at 91 ("B-91")*. In such a case, the Foreman will be identified as the Superintendent on a daily report. *T-1*. Whoever is listed as Superintendent on the daily report is the primary on-site supervisor. *B-25*.

As the on-site DCS representative, these supervisors also make valuable recommendations to DCS about the terms and conditions of other employees' work status, including the hiring of DCS employees and establishing their rates of pay. *G-38-39, 42*. Superintendents and Foremen are also responsible for coordinating and administering the projects from inception to completion. *See Deposition of Gregg Gregoire attached hereto as Exhibit "G" at 37 ("G-37")*. Superintendents/Foremen have the independent authority to purchase materials needed for the projects, coordinate with vendors, conduct walk-throughs with inspectors, and serve as the Company's liaison with clients. *T-1*. The following is the official job description for a DCS Superintendent:

> The superintendent will be responsible for the completion of new store build-outs, the remodeling of previously occupied buildings (POB), expansions, open-store remodels and special projects from start-up through completion. This work includes but is not limited to overseeing the entire project to ensure all work is completed to the client's and our standards in a safe work-man-like manner. The superintendent will coordinate the project schedule with the owners' on-site

---

[1] In 2006, for example, DCS employed more than 100 permanent non-exempt employees, and 15 permanent exempt employees. *G-64*.

2

> representative, subcontractors and vendors, and supervise and ... work with our
> crews ... from time to time. The superintendent will coordinate the mechanical
> and final building inspections, and obtain a Certificate of Occupancy . . .
> Complete <u>PROJECT OWNERSHIP</u> and <u>ACCOUNTABILITY</u> is in the hands of
> the superintendent.

*See DCS Superintendent Job Description attached hereto as Exhibit "I" at 002694 ("I-002694")*

*(emphasis in original)*.[2]   Additional/assigned tasks include:

- Coordination of project schedule with owner's on-site representative, subcontractors and vendors
- Supervision of subcontractors to ensure their work is completed correctly and on time
- Obtaining building permits
- Conducting weekly safety meetings
- Establishing flow charts in conjunction with the assigned project manager
- Negotiation of subcontractor and vendor contracts and purchases

*I-002695.*

Superintendents/Foremen also prepare administrative paperwork that is submitted to DCS on a regular basis. The paperwork includes "daily and weekly reports, copies of expense receipts, pictures of the job site, and progress reports." *See First Amended Complaint ¶ 15.* These activities are also part of the Superintendent's job description. *I-1.*

In addition to these regular duties, Superintendents and Foremen travel across the country to scope-out potential projects and develop bids for new DCS projects. Superintendents and Foremen actively participate in bidding for new projects and play an essential role in bringing in new business to DCS. *T-1.* This involves surveying the project site and meeting with potential subcontractors to understand their pricing, negotiate with them, and incorporate that information into the DCS bids. *G-37.*

---

[2]   Plaintiffs have agreed that this Superintendent job description is accurate. *See A-113-14; B-46.*

Because DCS is a nationwide general contractor, its jobs all require extensive travel. *T-1-2.* Employees drive to the DCS project sites, which are scattered all over the country. *T-2.* Projects generally last a few weeks up to a couple of months. *Id.* Some jobs involve travel between multiple jobs sites that are in the same region. *Id.* In addition, when certain Superintendents/Foremen travel, they haul a DCS company trailer. *Id.* These trailers contain DCS-owned tools and equipment necessary to complete a project. *Id.* Other Superintendents and Foremen carry DCS-owned tools necessary to do a job in their personal vehicles. *Id.* The tools are received from DCS or purchased by the Superintendent/Foreman with a DCS Home Depot credit card and transported to subsequent job sites. *Id.*

Before officially becoming employed by DCS, employees are required to fill out new hire paperwork through Administaff. Administaff is a Professional Employer Organization ("PEO") that provides outsourced human resources administration and compliance to companies. *T-2.* DCS has relied on Administaff as its PEO for many years. *Id.* Pursuant to their Client Service Agreement, DCS and Administaff serve as Joint Employers, with Administaff responsible for the payment of salaries and wages to staff. *See Service Agreement attached at Exhibit "I".* As part of their relationship, Administaff provides DCS with new hire paperwork, which includes a "Job Category" section. *Id.* One of the listed job categories is "Officer or Manager," and includes as an example "superintendents." *Id.* Other job categories include "Craft Worker" and "Laborer," which are described as "manual workers of relatively high skills" and "unskilled workers." *Id.* Because DCS has always understood that its Superintendents and Foremen fit into the "Officer or Manager" category, the Company has checked that box. DCS has checked the "Craft Worker" or "Laborer" boxes for all other workers. The Company forwards these forms to Administaff, which does DCS's

payroll. Administaff has never indicated there is any issue with the way the paperwork is filled out, how the employees are classified, or the employees' rates of pay. *Id.*

All DCS employees who are paid hourly receive overtime compensation when they work in excess of 40 hours per week. *T-2-3.* Such categories include carpenters, electricians and laborers. In fact, one or more Plaintiffs started working with DCS as hourly employees and were paid overtime. Only after being promoted to the positions of Foreman or Superintendent were they paid a salary. *T-3.* Plaintiffs never complained that they were paid too little, that they were paid incorrectly, or that they should receive overtime.[3] *Id.* Such complaints would have been somewhat surprising, given that Plaintiffs were paid their salary even in weeks where they did not work at all or only worked a portion of the week. For instance, Plaintiff Barlow was paid his full salary for 20 weeks in which he worked less than 40 hours. *C-107.* Notably, Plaintiff Parsons submitted a letter of resignation when DCS suggested moving away from having salaried employees and paying all employees hourly. *N-000224.*

In addition to being paid full salary, regardless of hours worked, DCS Superintendents and Foremen are provided medical insurance, a prescription drug program, dental insurance, a vision plan, life insurance, a cafeteria plan, paid vacation, paid holidays and sick days, personal days, participation in 401(K) and profit sharing plans, an Employee Assistance Program, adoption assistance, cell phones, calling cards, Home Depot credit cards, access to the DCS email system, and an option to participate in an equipment incentive program. *T-2.*

---

[3]      Plaintiffs certainly had the opportunity to do so. DCS had adopted an Employee Handbook that had extensive complaint procedures. Each of the Plaintiffs signed and returned the DCS Employee Handbook acknowledgement form, signifying that they were each aware of the DCS complaint procedure. *T-3; A-13, 55, 103; B-6; L-000044, 000070; K-000034, 000149; C-103-04, 128-29; M-000224.*

A.    **Facts About Each Plaintiff**

    1.    **Michael Villegas**

On February 18, 2006, Plaintiff Michael Villegas began working at DCS. *See Villegas Employee Records attached hereto as Exhibit "K" at 000017 ("K-000017")*. Because he was to serve as a Superintendent/Foreman, DCS checked the "Officer or Manager" box on his new-hire paperwork. *Id*. Therefore, Administaff treated Villegas as an exempt employee.

Villegas was never paid less than $455/week. *See Deposition of Michael Villegas attached hereto as Exhibit "A" at 111 ("A-111")*. He received the same salary whether he was working or not, and he understood that his pay was for all wages due him. *A-40, 82*. Villegas never complained to anyone that he was being paid too little or should be paid overtime. *A-13, 55, 103; B-6*. He worked as both a Superintendent and Foreman while at DCS. Villegas concedes that the DCS Superintendent job description is fair. *A-113-14*.

When Villegas served as a Superintendent, he considered himself to be the team leader of the DCS team on that project site. *A-101-02*. As the team leader, no one directly supervised him while he performed his duties. *A-107-08*. Villegas interviewed potential employees for DCS and recommended whether they should be hired, determined when they should start work, and was involved in the decision to retain them. *A-88, 91-93*. DCS followed his recommendations. *A-91-93, 99*. Other employees at DCS also believed Villegas had a say in what new people were paid, and Villegas was actually involved in the decision to increase wages of employees. *A-86-88, 92-93*. He represented the employees on his team to DCS and communicated to the company on their behalf. *A-97*.

Villegas also participated in bid work. In one instance, Villegas was on the phone at least 30 times to 30 different distributors while he worked on a bid. *B-97-98*. He also checked out stores for

DCS. *K-001578.* On project sites, Villegas was the on-site DCS representative to meet with vendors, contractors, and clients. *K-000312.*[4] He terminated subcontractors when he was not happy with their work. *K-001128, 001148.* Villegas was involved in the decision-making process about what materials were necessary to carry out DCS projects. *A-106.* He made daily assessments of what was needed on the project and then used his company-issued Home Depot credit card to purchase what was needed. *A-106-07; K-001609.* Furthermore, Villegas served as a conduit between DCS and contractors, landlords, customers, and vendors. *A-153, 155-60.* He detailed this work in his daily reports. *A-42.* Villegas estimates he spent two hours a day working on the reports. *A-8.* In the reports, he communicated his solutions to various on-site issues. *K-001681; 001609, 001560.*

Villegas consistently and routinely hauled a DCS trailer containing DCS equipment and tools around the country to different project sites. *T-2.* The trailer was assigned to Plaintiff Nudell, but Villegas is the person who drove it. *L-000079; T-2.* Villegas drove from Texas to projects in California, New York, New Jersey, Arizona, Massachusetts, Minnesota, and Washington.[5]

On May 25, 2007, Villegas voluntarily quit his job at DCS without giving the Company any notice. *T-3.*

### 2.   Kent Nudell

On February 18, 2006, Plaintiff Nudell started as a Superintendent at DCS. *See Nudell Employee Records attached hereto as Exhibit "L" at 000056 ("L-56").* Because Nudell was hired as a Superintendent, DCS checked the "Officer or Manager" box on the Administaff paperwork

---

[4] *See also K-001689, 001620, 001622, 001564, 001570, 001532* (Michael Villages Daily Reports).

[5] *See K-001523, 001477, 001439, 001411, 001396, 001329, 001260, 001238, 001228, 001156, 001151, 001688, 001642, 001644, 001619, 001581* (Villegas and Nudell Field Time Sheets).

and Administaff treated him as an exempt employee. *Id.* Nudell was never paid less than $455/week, and was paid his salary whether no matter the number of hours he worked. *B-35-36.* In fact, his salary was $60,000/year when he left DCS. *B-9.* He never told anyone at DCS he thought he was being paid incorrectly or that he should receive overtime, even though he did sign an acknowledgement form for the DCS Employee Handbook. *B-6; L-000044, 000070.* He was a Superintendent, and thinks DCS's Superintendent job description is accurate. *B-46.*

Nudell concedes that there was no one superior to him from DCS on a project site. *B-25.* He also admits he oversaw the tasks of all other DCS employees on-site. *B-19-20, 33.*[6] Nudell managed subcontractors.[7]   If there were two DCS projects located relatively close together, he was responsible for assigning people to the two projects. *L-000384.* Nudell took applications he received from individuals responding to local DCS job ads and interviewed them. *B-21-22.* If he thought they should be hired, he would signify that with a star in the corner. *Id.* He cannot remember a time when he said not to hire someone and DCS did it anyway. *B-30.* He also played a role in whether workers were placed, or remained, on the payroll. *B-27-29.* There was at least one time when he reported to DCS that someone was not doing his job and DCS took that person off the job. *B-20-21, 26.* Such changes were made when Nudell asked, especially if completion of the job was in jeopardy. *Id.*

---

[6] From August, 10, 2006 until January, 5, 2007, Nudell had two or more DCS employees each and every week he was on a project. *See L-001710, 001723, 001738, 001759, 001779, 001780, 001791, 001804, 001815, 001826, 001837, 001848, 001859, 001872, 001884, 001896, 001913, 001929, 001937, 001945, 001956, 002421, 002416* (Nudell Field Time Sheets), and then on two other weeks, *see L-002239, 002416, 002421.* There were also three weeks he did not work, see *L-002276, 002343, 002345.* Of the 38 weeks he worked on a project between August 10, 2006, and May 25, 2007, he had two or more DSC employees on 23 of them.

[7] *See also L-001639, 000985, 001075, 001124, 001100* (Nudell Daily Reports).

Nudell also scoped out proposals and participated in bids.  For example, he went to San Francisco to look over prints and scope-of-work to bid on jobs for at least three different Sears stores.  *B-83-84*.[8]  Nudell also met on-site with customers, inspectors, subcontractors, landlords, and senior client representatives.  *B-37, 85-92, 94-95, 98, 102*.[9]  Nudell spent up to two hours at a time with inspectors, and the inspections were often back-to-back.  *B-88*.  He also took care of lien waivers, and did the turnover with clients when projects were done.  *B-99*.  In addition, Nudell took measurements for stores and even apparently okayed a drawing – a task a laborer would never do.  *B-95-95*.  Nudell also had a Home Depot credit card and the discretion to purchase supplies for the job site when he determined they were needed.  *B-33-34*.[10]  Further, he was responsible for the DCS tool equipment list and various punch lists, including the one he created and maintained for himself.  *B-76-79, 93-94*.  He spent upwards of two hours a day working on daily reports  *B-38*.

Nudell consistently and routinely drove his personal vehicle containing DCS tools to jobs across the country.  Those tools were necessary for him to carry out the job.  *T-2; L-000079-80*.  Nudell transported DCS tools from Texas to projects in California, New York, New Jersey, Arizona, Massachusetts, Minnesota, and Washington.[11]

On May 25, 2007, Nudell voluntarily quit his job without providing the Company any notice.  *T-3*.

---

[8] *See also L-001657, 001052, 001646-49* (Nudell Daily Reports).

[9] *See also L-001636-38, 001589, 001587, 001599, 001600, 001655, 001677, 000984, 0001703, 0001062, 001014, 001065* (Nudell Daily Reports).

[10] *See also L-000292, 000294, 000297; 000421, 001025, 001110, 001048, 001047* (Nudell Daily Reports).

[11] *See* footnote 5, *supra*.

### 3.     William Barlow

On May 27, 2003, Plaintiff Barlow began working at DCS as a Superintendent.   *T-3*.
Unbeknownst to DCS, Barlow had a DWI conviction and was apparently delinquent in his child
support obligations.[12]

While working at DCS, Barlow was never paid less than $455/week. *See Deposition of*
*William Barlow attached hereto as Exhibit "C" at 53 ("C-53")*.   In fact, his salary was
approximately $75,400/year when he left DCS. *C-100*.   That salary was for all hours worked,
whether Barlow worked or not. *C-101-02*. He never indicated to anyone that he thought he should
be paid overtime, even though he was aware of the complaint procedure available to him in the
employee handbook. *C-103-04, 128-29; M-000224*. Because Barlow was hired as a Superintendent
of Foreman, his "New Employee Information Sheet" listed him as an "Officer or Manager."
Administaff paid Barlow as an exempt employee and Barlow never indicated to anyone that this was
inaccurate. *C-130*.

A majority of the time Barlow was at DCS, he worked on major projects as a team leader.
*C-47, 177*.[13] DCS would take his recommendations when it came to how confident he felt with
various subcontractors. *C-65-66*. For example, there were times Barlow would recommend the
removal of a subcontractor and DCS would either send the subcontractor a 24-hour notice or just
go ahead and replace the subcontractor. *C-67-68*. Barlow admitted that when he had other DCS
employees on the job site and he was serving as Superintendent, he managed those employees.

---

[12] Barlow had a DWI conviction in Brazos County and has not entered a plea yet in a DWI case in Wichita Falls.
*C-22-23*. Despite apparent child support delinquencies and multiple garnishments, Barlow testified in his deposition
that he was never delinquent and had never had his wages garnished. *C-16-17*.

[13] *See also M-000877, 000879, 000881-82, 000884, 000886, 000888, 000891, 000792, 000806* (Barlow Daily
Reports). He describes his daily activities on these days as "supervision."

*C-78*.[14]   Barlow also had influence over the terms and conditions of other DCS employees' employment.   Barlow also made hiring and pay rate recommendations for other DCS employees. Those recommendations were acted on by DCS.   *G-50-51*.[15]   Barlow would also recommend that certain DCS employees receive raises.   *C-173-74*.   On at least one occasion, Barlow recommended that another DCS employee be removed from a project and that recommendation was acted on by DCS.   *C-89*.

Barlow also travelled extensively on behalf of DCS.   He flew to different parts of the country to scope out proposals and bid work.   *C-107, 110; M-000906, 000251*.   Back on the job site, Barlow made sure the proper decisions were made so schedules were adhered to.   *C-85*.

Barlow made recommendations about supplies and equipment that were followed by DCS.   *C-86*.   He was given a Home Depot credit card and had the discretion to purchase items he needed to do the job.   *C-88, 91*.   Barlow also had blank DCS checks that he could use for supplies, and there was never an issue with him using the checks.   *C-43, 97-98, 175*.

---

[14] After August 10, 2006, Barlow regularly and customarily supervised two or more DCS employees. In the 20 remaining weeks in 2006, he supervised two or more DCS employees in 11 weeks, was on vacation effectively four weeks, was unstaffed and worked around the DCS home office two weeks, and worked on a DCS project where he did not supervise two or more DCS employees three weeks. Of he 14 weeks he was actually on a DCS project, he supervised two or more DCS employees approximately 79% of the time. *See M-000347, 000333, 000322, 000311, 000294, 000279, 000263, 000250, 000236, 000226, 000210, 000197, 000182, 000171, 000169, 000163, 000157, 000150, 000147, 000170* (Barlow Field Time Sheets). Barlow also worked for 25 weeks in 2007, and he supervised two or more DCS employees in 11 of those weeks, 10 of those weeks he was either sick, on vacation, or working on proposal work, and the remaining four weeks he worked on a DCS project with less than two DCS employees. Of the 15 weeks he was on a DCS project, he supervised two or more DCS employees approximately 73% of the time. Overall, of the weeks after August 10, 2006, that he worked on a DCS project, he supervised two or more DCS employees 76% of the time. *See M-000956, 000953, 000946, 000940, 000934, 000915, 000910, 000853, 000929, 000923, 000897, 000876, 000869, 000861, 000836, 000813, 000791, 000777, 000761, 000747, 000734, 000723* (Barlow Field Time Sheets).

[15] *See also M-000856, 000859, 000779* (Barlow Daily Reports).

Barlow communicated regularly with subcontractors, inspectors, and customer representatives. *C-95-96.*[16] Generally, the recommendations he made in his daily reports were followed by DCS. *C-88.* Barlow performed many administrative tasks for the successful completion of DCS projects such as meetings, blueprints and permits, .[17]

Barlow consistently and routinely hauled a DCS trailer containing DCS equipment and tools to different project sites across the country. *M-000224;* 000002, *T-2.* He drove approximately 10,000 miles around the nation on behalf of DCS. *C-107.* Barlow's employment records indicate that prior to August 10, 2006, more than half of the weeks he was employed by DCS he traveled interstate.[18] He travelled by motor vehicle, with a DCS trailer attached, between job sites in Texas, Pennsylvania, Maine, Massachusetts, Michigan, New Hampshire, New York, New Jersey, California, and Colorado.[19]

On February 12, 2007, Barlow voluntarily quit his job at DCS without providing the Company any notice. *M-000224.* He actually had another job already lined up. *C-38.* To obtain the job, Barlow submitted a resume in which he described his work at DCS. According to the resume, his duties included the following:

- Hired all sub-contractors for various commercial jobs
- Ordered all equipment, tools and supplies for jobs
- Managed other employees to completion of projects

---

[16] *See also M-000951, 000941, 000858, 000859, 000932, 000933, 000924-25, 000899-900, 000890, 000863, 000840, 000769, 000348-49, 000328, 000320, 000176, 000178-81* (Barlow Daily Reports).

[17] *See M-000955, 000947, 000937, 000912, 000857, 000930, 000324, 000296, 000174-75* (Barlow Daily Reports).

[18] See next footnote, *infra.*

[19] *See also M-000140, 000133, 000108000113, 000103, 000101, 000092, 000090, 000083, 000077, 000070, 000058, 000045, 000019, 000015, 000009, 000001-4, 000720, 000664, 000550, 000544, 000533, 000448, 000347* (Barlow Field Time Sheets).

- Trouble-shoot projects in crisis management situations pertaining to certain jobs ensuring timely completion and profitability
- Strategic planning and multiple project management
- Performance optimization
- Managed multi-site operations
- Decision-making
- Customer and client communications
- Managed large union commercial retail jobs ensuring all rules and regulations were adhered to and profitability achieved
- Supervised team of 20 plus contractors such as electrical, plumbing, flooring, HVAC and other engineering trades
- Direct contact client for purpose of trouble-shooting, problem-solving and profitability.
- New Business Development

*See Resume attached hereto as Exhibit "J" at 1 ("J-1").*

Barlow and other Plaintiffs confirm this is an accurate description of a Superintendent's job duties at DCS. *See C-78-84; D-39; F-16-17.*

### 4.   **William Parsons**

On February 6, 2006, Plaintiff Parsons started working as a non-exempt hourly employee at DCS. *See Wiliam Parsons Employee Records attached hereto as Exhibit "N" at 003214 ("N-003214").* Because he was in a non-exempt position, Parsons was paid overtime. *Id.* Subsequently, Parsons was promoted to Superintendent. *N-003231.* On March 4, 2006, Parsons' status changed to that of an exempt employee, no longer eligible for overtime. *N-03256.* His salary was $41,500 per year, and increased incrementally until it was $56,500 per year by June 3, 2006. *N-003257-59, 003261.* As a salaried employee, Parsons never made less than $455/week. *Id.* Parsons did sign and return the DCS Employee Handbook acknowledgement form, which reflected his understanding

of the DCS complaint procedure.  *N-003225, 003230*.  However, he apparently never made a

complaint about how he was paid.[20]

Parsons supervised DCS employees and contractors, and he met with vendors, client

representative, and inspectors on his DCS project sites.  *N-003638, 003564, 003545, 003549,*

*003503, 003455, 003484, 003285, 003294*.[21]  As an example, on August 11, 2006, he:

> [m]et with the Taft building codes enforcement officer, the city planner, and the
> fire marshal today.  Briefly discussed scope of work, and no problems were
> discovered.  Was informed that we need a city license to perform work, faxed
> paperwork to office.  Fielded calls from carpenter hopefuls, and will meet with
> both on Monday morning.  Reviewed blueprints and job info sheet for most of the
> day to familiarize myself with the scope of work.  Conference call.

*N-003503.*

Parsons, as Superintendent, had the discretion to work out staffing problems with

subcontractors.  *N-003444, 034467, 003469, 003482*.  He also had the discretion to create and make

changes to drawings for submission to external sources, such as the city.  N-003276, 003279.

Parsons also made recommendations with respect to the hiring and rates of pay of other DCS

employees, which were acted on by DCS.  *G-50-51*.  Parsons had a company issued cell phone,

conference calling card, and Home Depot credit card.  *N-003242, 003251-52*.  He regularly made

purchases for his DCS projects.[22]  Parsons also participated in the bidding process.  *N-003632,*

*003405, 003490.*

---

[20] Defendants' records do not reflect any complaints by Parsons about his compensation.  However, Defendants have
never been permitted to ask Parsons about this, or any other issue.  Despite a Court Order requiring Plaintiffs'
depositions, despite Notices of Deposition for Parsons, and despite correspondence requesting dates for Parsons'
deposition, Parsons never appeared for deposition in this case.

[21] Parsons did not participate in discovery and Defendants were unable to depose him; therefore, Defendants rely,
for purposes of this motion, on Parsons employee records and an affidavit from defendant Gregoire.

[22] *See N-003768-69, 003779, 008803, 003808, 003816, 003836, 003851, 003875* (William Parsons Weekly
Expense Reports); *N-003581, 003379, 003452, 003273, 003315.*

Parsons also routinely hauled a DCS trailer around the country that contained DCS equipment and tools. N-003636, 003609, 003502; *T-2*. He drove the trailer to projects in New York, Maine, Massachusetts, Texas, Arizona, and California.[23]

On February 12, 2007, Parsons resigned without notice. *N-003225, 003230*.

### 5.   Robert Beltran

On July 25, 2005, Plaintiff Robert Beltran started at DCS as a carpenter. He was paid as a non-exempt hourly employee. *See Robert Beltran Employee Records attached hereto as Exhibit "O" at 004415 ("O-004415")*. When he worked in excess of 40 hours per week, he received overtime compensation. *O*. Unknown to DCS at the time, Beltran had an extensive criminal history. [24]

On August 6, 2005, Beltran was promoted to Superintendent at a salary of $950.00 per week. That salary continued to increase throughout Beltran's employment and he was never paid less than $455/week while at DCS. *See Deposition of Robert Beltran attached hereto as Exhibit "D" at 65 ("D-65")*. Beltran never indicated to anyone at DCS that he thought he should be paid overtime or that he was paid inappropriately. *O-004400; D-40*.

Each week Beltran worked as a DCS Superintendent, there were at least two other DCS employees on his projects, not including temporary workers. *D-45-54*.[25] Beltran was also the team leader for the major projects he worked on while at DCS. *D-44*. Besides overseeing the work of

---

[23] *See N-003770, 003777, 003792, 003798, 003801, 003804-05, 003813, 003817, 003852, 003876-77* (William Parsons Mileage Logs).; *N-003500*.

[24] Beltran has been convicted of two DWIs in Nueces County, forgery in Harris County, and conspiracy to sell equipment in Webb County. *D-11-12, 19-20, 14-17*.

[25] *See also O-004521, 004515, 004508-09, 004497, 004489, 004478, 004483, 004470, 004462, 004460, 004444, 004439* (Robert Beltran's Field Time Sheets).

DCS   employees   and   contractors,   he   met   with   client   representatives   and inspectors, made purchasing decisions as needed for the project, and completed daily reports.[26] Beltran served as DCS's representative to vendors on the site, such as plumbers and electricians. *D-65*. He had a company issued Home Depot credit card and cell phone to be used to complete his job. *O-004405, 004402*.

Beltran concedes that a DCS Superintendent engages in each of the following activities:

- Hired all sub-contractors for various commercial jobs
- Ordering all equipment, tools and supplies for jobs
- Managing other employees to completion of projects
- Trouble-shooting projects in crisis management situations pertaining to certain jobs ensuring timely completion and profitability
- Strategic planning and multiple project management
- Performance optimization
- Managing multi-site operations
- Decision-making
- Customer and client communications
- Managing large union commercial retail jobs ensuring all rules and regulations were adhered to and profitability achieved
- Supervising a team of 20 plus contractors such as electrical, plumbing, flooring, HVAC and other engineering trades
- Directly contacting clients for purpose of trouble-shooting, problem-solving and profitability.
- New Business Development

*D-39*.

Beltran also consistently and routinely drove his personal vehicle across the country to job sites. When he did so, the vehicle contained DCS tools necessary to do his job. *T-2*. In particular, Beltran drove from Texas to projects in Indiana and Ohio. *O-004521, 004478*.

---

[26] *See also O-004516-20, 004510-14, 004503-07, 004498-501, 004484-88, 004479-82, 004471-74, 004476-77, 004463-64, 004466-69, 004461, 004448-52, 004456, 004440-43* (Beltran Daily Job Reports).

On November 2, 2005, Beltran was terminated by DCS for misconduct.  *T-3*.  The company

discovered that he had falsified time sheets and indicated he was working at a job in Columbus,

Ohio when he was actually at home in Texas.  *See Deposition of Jimmy Beltran attached hereto as*

*Exhibit "V" at 23-24.*

After leaving DCS, Beltran submitted an application to a company called Remedial

Construction.  In the application, Beltran did not mention that he had worked with DCS at all.  *D-*

*27, 59*.  He also did not mention he had been convicted on a crime other than a minor traffic

violation.  *D-36*.  The Remedial Construction application also asked whether Beltran had ever

served in the armed services of the United States.  *See Exhibit 1 to Beltran Deposition Transcript,*

*attached hereto at Exhibit "D"*.  Beltran indicated he had not.  However, he was undesirably

discharged from the United States Army for going AWOL.  *D-61*.

Beltran also falsified an application he submitted to another employer, Pro-Waste.[27]  When

asked in his deposition if he was a liar, Beltran answered, "[i]f you want to take it that way, yes."  *D-*

*58*.

### 6. John Beltran

On July 27, 2005, Plaintiff John Beltran started working at DCS as a carpenter.  *T-3; John*

*Beltran Employee Records attached hereto as Exhibit "P" at 004308 ("P-004308")*.  While working

as a carpenter, Beltran was paid as an hourly employee.  *P-004323*.

On September 3, 3005, Beltran was promoted to Foreman.  *P-004310*.  He became an

exempt salaried employee making $900 per week.  *Id*.  He signed an acknowledgement form

---

[27] Robert Beltran falsified his education and employment information.  He chose not to answer a question regarding whether he had served in the U.S. Military or had any Navy Service, despite having been undesirably discharged for going AWOL.  *D-57-61*.

17

indicating that he understood and agreed to the DCS complaint procedure, but never complained to anyone at DCS about his pay. *P-004319.*

Beltran was issued a company cell phone and Home Depot credit card for use on DCS projects. *P-004333, 004311.* In fact, he made frequent trips to Home Depot. *P-004336, 004341, 004344, 003247.*

Beltran consistently and routinely hauled a DCS trailer, containing DCS equipment and tools, around the country to different project sites. *T-2; P-00437, 004368.* In particular, Beltran drove to projects in Texas, Indiana and Ohio. *T-; P-00437, 004368.*

On November 2, 2005, Beltran was terminated for providing false information to the Company regarding the whereabouts of his family member, Robert Beltran. *T-3.*

### 7.    Carl Beltz

On August 11, 2005, Plaintiff Beltz started working as a Superintendent at DCS. *See Carl Beltz Employment Records attached hereto as Exhibit "Q" at 004130 ("Q-004130").* Unbeknownst to DCS, Beltz had an extraordinary criminal history.[28]

While working at DCS, Beltz was never paid less than $455/week. *See Deposition of Carl Beltz attached hereto as Exhibit "E" at 30 ("E-30").* He understood that his wages were for all hours worked and never complained to anyone at DCS about not receiving overtime. *E-32-34.*

According to Beltz, every DCS project needed a Superintendent to call the shots, and he was that person. *E-20-21.* Beltz was the team leader on at least one project. He served as the

---

[28] Carl Beltz has been charged with, or convicted of, the following criminal offenses: unlawful carrying of a weapon in Harris County; multiple assaults in Harris County, Tarrant County, and various counties in Georgia; various charges for public drunkenness and public melee outside of Harris County, theft by receiving in Harris County, multiple terroristic threats in Harris County, multiple DWIs in Harris County and Tarrant County; robbery in Montgomery County; theft; and capital murder. *E-39-44.*

18

company representative and go-to person for DCS when visitors came to the site. *E-49, 53; Q-004155-56, 004149*. Beltz also made purchases for the job site when he realized materials were needed. He also was entrusted with a DCS cell phone. *E-50-51, 53; Q-004139, 004158, 004165, 004191*.

Beltz consistently and routinely drove his personal vehicle containing DCS tools necessary to do his job across the country to various DCS job sites. *T-2*. This includes tools he purchased on behalf of DCS.[29] Beltz drove to projects in Texas and Massachusetts. *Q-004208, 004151, 004145, 004171, 004196*.

On or about August 29, 2005, Beltz left a DCS job without notice. *Q-004129*. In fact he did not even wait at the project site long enough for someone to replace him. *E-38*.

### 8.    David Garcia

On July 25, 2005, Plaintiff Garcia started working as a Foreman at DCS. *See David Garcia Employment Records attached hereto as Exhibit "R" at 004069 ("R-004069")*. Garcia was never paid less than $455/week while at DCS, and he understood his salary was for all hours worked. *F-30, 40*. Garcia never told anyone at DCS he thought he should be paid overtime. *F-39*. He served as a Foreman at DCS, and then was promoted to superintendent effective August 6, 2005. *R-004065, 004069*. Garcia understood that there was a DCS Superintendent on each job to serve as a supervisor, and that person was a team leader. *F-36*. Garcia served as superintendent on the Wells, Maine project. *R-004095-96, 004102*. Garcia would complete daily reports, which were part of the Superintendent's job. *F-17; R-004097-101*. He also communicated with vendors on the DCS project site on behalf of DCS. *F-62*. He never told

19

anyone he thought he was incapable of being a Superintendent. *F-57*. Garcia also had the discretion to buy supplies for DCS project sites when needed. *F-33-34*.

Garcia consistently and routinely drove his personal vehicle containing DCS tools necessary to do his job across the country to various DCS job sites. *T-2*. This includes tools he purchased on behalf of DCS.[30]   For instance, Garcia drove to projects in Texas and Maine. *R-004120*.

On September 1, 2005, Garcia voluntarily quit his job at DCS without notice. *R-004063*.

### 9.    Jesse Gutierrez

Little is known about Jesse Gutierrez.  Despite Rule 37 and this Court's Order Denying Plaintiffs' Motion to Quash Depositions, Gutierrez has failed to respond to Interrogatories, has not provided a Verification, and has not submitted to a deposition.

What is known from a review of Gutierrez's personnel records is that he started at DCS as a Superintendent on November 12, 2005.  He traveled from Texas to Michigan to work on a DCS project and abandoned his job.  He was terminated on December 23, 2005. *See Exhibit "T" and David Garcia Employee Records attached hereto as Exhibit "S" at 004030, 004052*

## III.   STANDARD OF REVIEW

Rule 56 "*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*emphasis in original*).   In the

---

[29] Copies of receipts from Beltz of DCS tools he purchased that would be transported to subsequent job sites are attached to Exhibit Q.

[30] Copies of receipts from Garcia of DCS tools he purchased that would be transported to subsequent job sites are attached to Exhibit R.

interpretation of Rule 56, this Court is guided by the Supreme Court's trilogy of *Celotex Corp. v. Catrett, Anderson v. Liberty Lobby, Inc.*, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*[31]

Pursuant to Rule 56, judgment shall be entered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Id.* Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, that party need not *negate* the elements of the nonmovant's case. *Id.* (*emphasis in original*).

"The mere existence of *some* alleged factual disputes between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact." *Anderson*, 106 S.Ct. at 2510 (*emphasis in original*). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 106 S.Ct. at 2510.

A dispute over a material fact is "genuine" only if there is a genuine issue for trial that must be decided by the trier of fact. There is no "genuine" issue for trial if the evidence is such that a reasonable jury could not return a verdict for the nonmoving party. *Anderson*, 106 S.Ct. at 2510.

The movant does not have a burden to negate or disprove matters on which the nonmovant will have the burden of proof at trial. In fact, the movant is not required to produce any evidence at all on those matters. *Celotex*, 106 S.Ct. at 2554. Rather, the movant meets his or her summary judgment burden simply by showing that "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 106 S.Ct. at 2554.

_____