UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MICHAEL VILLEGAS, et al., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civ. No. 4:07-cv-2165 |
| | § | |
| DEPENDABLE CONSTRUCTION | § | |
| SERVICES, INC. and GREGG | § | |
| GREGOIRE, INDIVIDUALLY, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Pending before the Court are parties' Cross-Motions for Summary Judgment, (Doc. Nos. 37, 38, 40-44, 47, 48, 50), and Plaintiffs' Motion to Substitute Declarations (Doc. No. 59). After considering the briefing and the applicable law, the Court has determined that Defendants' Motion for Summary Judgment should be denied in part and granted in part, Plaintiffs' Motions for Summary Judgment should be denied, and Plaintiffs' Motion to Substitute should be granted.

## I. INTRODUCTION

This action involves claims by nine Plaintiffs for unpaid overtime while employed by Defendant Dependable Construction Services, Inc. ("Dependable"). Dependable is a full-service general contractor with a sole office in Spring, Texas. Defendant Gregg Gregoire is its president. The company specializes in construction services including expansions, renovations, and previously occupied building conversions for chain stores such as K-Mart, Dollar Tree, and Sears in locations nationwide. The typical Dependable construction project is completed within 3 to 12 weeks. (William Barlow Dep., Doc. No. 50, Ex. C, 47:19-47:25; Dependable Job Description, Ex. I.)

1

Every project requires a superintendent. Dependable projects typically involve subcontractors, including carpenters and electricians, temporary laborers hired locally for each project, and sometimes Dependable employees in addition to the superintendent. Within Dependable, a superintendent is a position with more authority than a foreman, and foremen rarely work without a superintendent; superintendents, however, occasionally staff a project together. In its advertisements, Dependable describes the superintendent position as:

> "responsible for the completion of new store build-outs, the remodeling of previously occupied buildings (POB), expansions, open-store remodels and special projects from start-up through completion. This work includes but is not be (sic) limited to overseeing the entire project to ensure all work is completed to the clients and our standards in a safe work-man-like (sic) manner. The superintendent will coordinate the project schedule with the owners' on-site representative, subcontractors, and vendors, and supervise and/or work with our crews…. The superintendent will coordinate the mechanical and final building inspection, and obtain a Certificate of Occupancy. The superintendent will answer directly to the Senior Project Manager and work with the Project managers and Project Assistants. Complete PROJECT OWNERSHIP and ACCOUNTABILITY is in the hands of the superintendent.

(Doc. No. 50, Ex. I.)

Plaintiffs' roles in the company, as set forth in their Motions for Summary Judgment, and dates of employment are presented in Table 1.

Table 1[1]

| Name | Title | Start Date | End Date |
|---|---|---|---|
| Michael Villegas | carpenter foreman | 2/22/2006 | 5/25/2007 |
| William Barlow | superintendent | 11/4/2004 | 6/1/2007 |
| John Beltran | carpenter[2] | 7/23/2005 | 11/4/2005 |
| Robert E. Beltran | carpenter foreman[3] | 7/23/2005 | 11/4/2005 |
| Carl Edward Beltz | superintendent | 8/6/2005 | 9/2/2005 |
| David Garcia | carpenter foreman | 7/23/2005 | 9/2/2005 |
| Jesse Michael Gutierrez | carpenter foreman | 11/12/2005 | 12/23/2005 |
| Kent Nuddell | field superintendent | 2/22/2006 | 5/25/2007 |

---

[1] Start and end dates and job titles are approximate. Some of the dates are disputed by Defendants, as noted in subsequent footnotes. Except for "carpenter," all of these positions were considered exempt.

[2] According to Administaff records provided by Dependable, John Beltran's status changed from carpenter to carpenter foreman on September 3, 2005. (Doc. No. 50, Ex. P-004310.)

[3] Administaff records show Robert Beltran's promotion to carpenter foreman as of August 6, 2005. (Doc. No. 50, Ex. N, at 2.)

| William Forest Parsons | superintendent[4] | 2/16/2006 | 2/22/2007 |

The company has a construction side and an accounting side both ultimately managed by Gregoire. (Gregoire Dep., Doc. No. 54, Ex. A, 34:6-34:18.) The accounting side typically has one to three employees. (Doc. No. 54, Ex. A, 35:4-35:7.) In 2006, Dependable allegedly employed over 100 people, approximately 15 of whom were exempt from the overtime requirements of the Fair Labor Standards Act ("FLSA"). (Doc. No. 50, Ex. G, 64:8-64:22.) Dependable uses Administraff, a company that provides outsourced human resource management, to facilitate the payment of salary and wages to its employees. (Doc. No. 50, Ex. T, ¶ 7.) Dependable relies on Administaff to determine whether its employees are exempt from FLSA overtime requirements. (Doc. No. 54, Ex. A, 57:1-58:1; 58:17-59:9.) All of the Plaintiffs were in positions that Dependable considered exempt from FLSA overtime requirements. Each was paid more than $455 per week on a salaried basis, intended to cover all hours worked. Plaintiffs allegedly worked from 40 to 100 hours per week. (Pl. Am. Compl., Doc. No. 25, ¶ 6.)

In addition to their manual labor, superintendents and foremen prepare and electronically submit administrative paperwork to Dependable, including daily and weekly reports, copies of expense receipts, pictures of the job site, and progress reports. This work took up to five hours per week in addition to other labor. (Doc. No. 25, ¶ 15.) As superintendents and foremen, Plaintiffs all received a credit card and a cell phone from Dependable to use at the project sites. Gregoire alleges that all of the Plaintiffs had the authority to waive or deviate from policies and procedures without prior approval including the ability to relocate fire extinguishers, wall gondolas, floor gondolas, placement of walls, toilet partitions and accessories, graphics, safes, and door swings as well as to change paint colors, flooring applications, lay-out of acoustical

---

[4] Administaff records show that Parsons became a superintendent on December 15, 2006. (Doc. No. 50, Ex. N-003231.) He may have been in an exempt position prior to that time, but as of his hiring date, February 6, 2006, he was listed as a non-exempt carpenter. (Doc. No. 50, Ex. N-003214.)

ceilings and roof penetrations. (Doc. No. 50, Ex. T, ¶ 15.) In addition, Gregoire alleges the foremen and superintendents handled complaints and arbitrated disputes involving employees and subcontractors. (Doc. No. 50, Ex. T, ¶ 18.) Facts particular to each Plaintiff are provided below.

### 1. Michael Villegas

Dependable hired Plaintiff Villegas in February 2006 as a temporary foreman. (Michael Villegas Dep., Doc. No. 50, Ex. A, 42:12-42:23; Ex. K-000017.) While on the job, he performed both manual work, including cleaning, setting up, and "fixturing," as well as non-manual work. (Doc. No. 50, Ex. A, 108:12-108:22.) Villegas was eventually promoted to superintendent, sometime in March 2007, and he admitted that he was the leader of the "Dependable team" for the Shoreline, Washington Sears project, and no one else supervised his sites there. (Doc. No. 50, Ex. A, 101:10-101:24; 102:20-103:21; 108:3-108:6; Doc. No. 50, Ex. K-001619, K-001642.) The time sheets submitted suggest that this project was unlike every other project on which he worked because Villegas the sole superintendent on the project. (Doc. No. 50, Ex. K-01609, K-01619, K-01620, K-K-01622).

### 2. William Barlow

Dependable hired Plaintiff William Barlow in 2003. (Barlow Dep., Doc. No. 54, Ex. L, 31:3-31:9.) Prior to working for Dependable, Barlow managed construction for projects at Gibbs Construction, and worked as a project superintendent at Acoustics, Inc. (Doc. No. 50, Ex. J; Doc. No. 54., Ex. L, 28:8-28:13.) During the period at issue in this lawsuit, Barlow was a superintendent and his direct supervisor was a senior project manager at Dependable. (Doc. No. 50, Ex. C., 53:16-53:25.) Barlow left the company on June 25, 2007. (Doc. No. 54, Ex. L, 112:19-113:18.)

### 3. John Beltran

John Beltran began working at Dependable as a carpenter, a non-exempt position, in July 2005. (Gregoire Aff., Doc. No. 50, Ex. T, ¶ 13.)   In September 2005, he was promoted to carpenter foreman, an exempt position. (Doc. No. 50, Ex. P-004310.) He left the company in November of 2005. (Doc. No. 50, Ex. N-004308.)

### 4. Robert E. Beltran

Plaintiff Robert Beltran began working for Dependable in 2005, and was promoted on August 6 or 12, 2005, to superintendent or carpenter foreman. (Doc. No. 50, Ex. T ¶ 12; Doc. No. 50, Ex. N, at 2, Doc. No. 54, at 23.) He was terminated in November of 2005. (Doc. No. 50, Ex. T ¶ 12, Doc. No. 50, Ex. N, at 3.)

### 5. Carl Edward Beltz

Dependable hired Carl Beltz in August of 2005 as a superintendent. (Doc. No. 50, Ex. Q-004130.) Unlike the other Plaintiffs, he did complain about his wages at one point, but not regarding overtime: he allegedly told Dependable management that others were paid more, his per diem was too small, and he was unfairly not reimbursed for driving to the hospital. (Doc. No. 50, Ex. E, 32:4-33:18, 34:11-34:25.) He left the company in September 2005. (Doc. No. 50, Ex. Q-004129.)

### 6. David Garcia

Dependable hired Plaintiff David Garcia in July 2005 as a carpenter foreman. (Doc. No. 50, Ex. R-004069.)  He was eventually promoted to superintendent for a site in Wells, Maine. (Doc. No. 50, Ex. R-004095, R-004096, R-004102.)  He never complained about his wages or that he should have been paid overtime. (Doc. No. 50, Ex. F, 39:20-39:22.) He left the company in early September 2005.

**7. Jesse Michael Gutierrez**

Plaintiff Jesse Michael Gutierrez started working for Dependable in November 2005 as a carpenter foreman. He left the company in late December 2005. (Doc. No. 50, Ex. T ¶ 14.)

**8. Kent Nudell**

Dependable hired Plaintiff Kent Nudell as a field superintendent in February 2006. (Doc. No. 50, Ex. L-00056.) He left the company in May of 2007. (Doc. No. 50, Ex. T ¶ 10.)

**9. William Forest Parsons**

Plaintiff William Forest Parsons began working as a temporary carpenter in February 2006, and was paid overtime. (Doc. No. 50, Ex. N-003214.)  In December 2006, he was promoted to superintendent. (Doc. No. 50, Ex. N-003231.) He left the company in February 2007, allegedly because he did not wish to be paid hourly. (Doc. No. 50, Ex. N-000224.)

Plaintiffs claim that they are entitled to unpaid overtime under the FLSA because their primary duty for Dependable was manual labor. Defendants respond that they do not owe any overtime wages because all Plaintiffs were properly classified as FLSA-exempt either under the administrative or Motor Carrier Act exemptions. Further, they contend that Plaintiffs Barlow, Nudell, and Robert Beltran are also exempt under the executive exemption. Plaintiffs ask for damages in the amount of their unpaid overtime compensation, liquidated damages as provided under FLSA, attorneys fees, costs, reimbursable out-of-pocket expenses for construction materials Plaintiffs were required to purchase for their work, and interest. The Court has jurisdiction under 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

## II. SUMMARY JUDGMENT

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on

the evidence thus far presented.  FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).  A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party.  *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).  The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Id.*  Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence.  F.R.C.P. 56(e)(1); *See, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III. FAILURE TO COMPLY WITH DISCOVERY REQUESTS

Defendants argues that Gutierrez should be dismissed from the case for failure to comply with discovery requests. In June 2008, the Court ordered the Plaintiffs to provide complete and verified responses to Defendants' interrogatory Number 3 and to execute the Employment Records Authorization served on each of them. (Doc. No. 32.) Gutierrez was never deposed and did not send in an employment records authorization, an interrogatory verification, or any response to an interrogatory seeking employer information. Consequently, because of his violation of the Court's Order, his Motion for Summary Judgment will be denied and all of his claims will be dismissed without prejudice.

## IV. PLAINTIFF'S MOTION TO SUBSTITUTE DECLARATIONS

Also pending before the Court is Plaintiffs' Opposed Motion to Substitute Declarations. (Doc. No. 59.) Defendants argue that the declarations attached to Plaintiffs' Motions for Summary Judgment are invalid because they are not dated, although they are signed and made under the penalty of perjury. Further, they argue that Plaintiffs' declarations include conclusory statements that contradict their deposition testimony. Plaintiffs have now provided dated versions of the signed declarations and ask that they be substituted for the undated declarations.

It is a well-settled rule that a plaintiff cannot create an issue of material fact merely by manufacturing a conflict in his own testimony by submitting an affidavit that contradicts an earlier deposition. *See Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806 (1999) (collecting cases and declining to upset this settled law, but not explicitly endorsing it); *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996). Further, unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment. *Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997); *see Darnell v. Target Stores*, 16 F.3d 174, 176 (7th Cir. 1994). As attachments to their Motions for Summary Judgment, Plaintiffs provided signed, undated affidavits in which they claimed they did not perform any of the activities the regulations suggest as indicative of administrative or executive employees, and they were manual workers. (Doc. Nos. 37, 38, 40-44, 47, 48, Ex. B.) Plaintiffs' affidavits used the language of the relevant regulations rather than providing specific facts to sustain their arguments. *Id.* To the extent that these declarations contradict their deposition testimony or are conclusory, the alleged "facts" provided in the signed declarations do not create an issue of material fact. Consequently, the Court will exercise its discretion to grant Plaintiffs' Motion, but

the declarations will be considered only to the extent they do not contradict deposition testimony or provide conclusory allegations.

## V. FAIR LABOR STANDARDS ACT

### A. Standard

In general, under the Fair Labor Standards Act ("FLSA"), employees who work more than 40 hours per week must be compensated for their overtime. 29 U.S.C. § 216(b). Construction workers in non-management positions must be paid overtime regardless of their salary. 29 C.F.R. 541.3(a). Employees who occupy administrative and executive positions do not need to be paid overtime. *See* 29 U.S.C. § 213(a)(1). The exemptions are "construed narrowly against the employer seeking to assert them," and the employer bears the burden of proving that employees are exempt. *Dalheim v. KDFW-TV,* 918 F.2d 1220, 1224 (5th Cir. 1990) (quoting *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392 (1960)). Although the question of whether a particular duty is exempt presents a legal question, the amount of time devoted to those duties, and the significance of those duties, present an issue of fact. *See Icicle Seafoods, Inc.,* 475 U.S. 709, 714 (1986); *Bratt v. County of Los Angeles*, 912 F.2d 1066, 1069 (9th Cir. 1990); *Reich v. Avoca Motel Corporation*, 82 F.3d 238, 240 (8th Cir. 1996).

An employee in an administrative capacity is one:

(1) Compensated on a salary or fee basis at a rate of not less than $455 per week …;
(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200.

Executive employees are exempt from the overtime provisions of FLSA. *See* 29 C.F.R. § 541.100. Executive employees are those who are:

(1) Compensated on a salary basis at a rate of not less than $455 per week… exclusive of board, lodging or other facilities;
(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
(3) Who customarily and regularly directs the work of two or more other employees; and
(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100. *See also* Department of Labor, Wage and Hour Opinion Letter, FLSA 2007-3 (Jan. 25, 2007).

The actual day-to-day job activities of the employee are relevant to determining whether the employee is exempt employees under the FLSA, not the labels the employee or the employer place on those duties. *See, e.g., Tyler v. Union Oil Co. of Calif.,* 304 F.3d 379, 404 (5th Cir.2002); *Kohl v. Woodlands Fire Department*, 440 F.Supp. 2d 626, 637 (S.D. Tex. 2006); *Schaefer v. Ind. Mich. Power Co.,* 358 F.3d 394, 400 (6th Cir. 2004); 29 C.F.R § 541.2. "The essence of the test is to determine the employee's chief or principal duty …. The employee's primary duty will usually be what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time." *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990) (internal citations omitted). However, if such employees are closely supervised and earn little more than the nonexempt employees, they generally do not satisfy the primary duty requirement. 29 C.F.R. § 541.700(c).

"Time is not the sole test, and employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." 29 C.F.R. 541.700(b). The fact that an employee spends 65 to 90 percent of his time on nonexempt tasks "is not a controlling factor under the regulations" for determining whether the employee was exempt from the FLSA's overtime. *Spinden v. GS Roofing Products Co., Inc.*, 94 F.3d 421, 427 (8th Cir. 1996); *Murray v. Stuckey's, Inc.,* 939 F.2d

614, 618 (8th Cir. 1991), *cert. denied,* 502 U.S. 1073 (1992); *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1113 (9th Cir. 2001). That the majority of an employee's time "was not spent [on exempt tasks] … does not preclude the determination that [his] primary duties consisted of the administration of the general business operations … such that the administrative and supervisory duties performed by [the employee] were of principal importance to [the employer], as opposed to those collateral tasks which may have taken more than fifty percent of [his] time." *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 332 (5th Cir. 2000).

### B. Analysis

#### 1. Administrative Exception

Defendants argue that all Plaintiffs were exempt from overtime compensation because they qualified for the administrative exemption. Plaintiffs respond that they are not exempt because their work related to the product of Dependable's business and not to administering the business affairs of the enterprise. In addition, they claim that they did not exercise independent judgment and discretion.

#### a. Production versus Administration

Defendants argue that all Plaintiffs performed activities related to the general business operations of Dependable rather than production-type work because they ensured that the construction projects were completed on-time and on budget, ensured that there were adequate materials, and that customers were satisfied. Defendants contend that Plaintiffs Barlow, Nudell, and Villegas "went out on bids" and thus carried out management policies. Defendants also argue that all Plaintiffs qualify as administratively exempt because they were "team leaders."

Plaintiffs respond that they were primarily responsible for "producing" the construction projects of Dependable and not involved in administering the business affairs. They contend that

even going out on bids is not providing advice on matters that involve policy determinations, but rather providing information used in the course of daily operations. Further, they argue that negotiating on behalf of a business and representing that business in connection with ordinary production does not constitute "servicing" a business. Plaintiffs do not respond to the "team leader" argument.

In order to qualify for the administrative exemption, an employee's primary duty must be "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). Thus, where an employee is primarily involved in producing the product of the company rather than "servicing" the company, the administrative exemption does not apply. "Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as … accounting; budgeting; auditing; … quality control; purchasing; procurement; … safety and health; personnel management; human resources; … government relations … legal and regulatory compliance; and similar activities." 29 C.F.R. § 541.201(b).

In promulgating the 2004 FLSA regulations, however, the Department of Labor explained that the distinction between production and administrative tasks is but one factor in the ultimate analysis of whether the employee's work is directly related to general business operations. Department of Labor, Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees; Final Rule, 69 Fed. Reg. 22121, 22141 (April 23, 2004) (citing *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1127 (9th Cir. 2002)).

Noting that the production/administration distinction is not dispositive, the Court will examine the Plaintiffs' activities to determine whether they are primarily involved in managerial activities under the regulations.[5] Some employees with occasional managerial tasks do not qualify for the administrative exemption. *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 904 (3d Cir. 1991) (holding that salespeople of electrical products were involved in production rather than administration, even though they may sometimes "negotiate," "represent the company" and "purchase" on the company's behalf). Employees, however, also involved in non-management activities may be exempt if their activities are not heavily supervised and they are primarily responsible for the success or failure of the venture. *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990) (internal citations omitted) (contrasting non-exempt news producers with other cases involving exempt managers of the hot food section of a restaurant and exempt editors responsible for an entire periodical); *see also Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 585 (5th Cir. 2006) (holding that managers, claims adjusters, and claims processors were exempt because they did not produce the product of the business, insurance polices, but rather resolved claims arising out of the policies); *Howell v. Ferguson Enterprises, Inc.*, 93 Fed. Appx. 12, 14-15, 2004 WL 231291, *2 (5th Cir. 2004) (upholding administrative exemption where employee's duties serviced business's most important account at the time, including negotiating with the customer, promoting sales, and offering discounts on products); *Bratt v. County of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir. 1990) (holding that the probation officers at issue were not exempt because they "provide information which the court uses in the course of its daily

---

[5] In the context of a service industry, such as municipal services, the "product" is the activities that are the "primary service goal" of the agency. *See Smith v. City of Jackson*, 954 F.2d 296, 299 (5th Cir. 1992) (explaining that the product of a fire department is "fire protection services"). In the context of a construction company, therefore, the product is likely the activities of the business, including remodeling, demolition, etc. Activities related to managing or administering the remodeling, demolition, etc., are distinct from production and involve "servicing" the business.

production activities" rather than provide recommendations on the proper way to conduct the business of the court).

In addition, an employee

who leads a team of other employees assigned to complete major projects for the employer (such as purchasing, selling or closing all or part of the business, negotiating a real estate transaction or a collective bargaining agreement, or designing and implementing productivity improvements) generally meets the duties requirements for the administrative exemption, even if the employee does not have direct supervisory responsibility over the other employees on the team.

29 C.F.R. § 541.203(c). Other courts have found that a "major project" includes an auction for an auction house, or a $1.5 million capital improvement project. *Orr v. James D. Julia, Inc.*, Civ. No. 07-51-B-W, 2008 WL 2605569, at *14 (D.Me. June 27, 2008); *Reber v. AIMCO/Bethesda Holdings, Inc.*, No. SA CV07-0607 DOC (RZx), 2008 WL 4384147 (C.D.Cal. Aug. 25, 2008). The Civil Service regulations under FLSA define major projects by examples from a similar list of activities and add one more:

a lead auditor who oversees an audit team in an auditing agency and who is assigned responsibility for leading a major audit requiring the use of substantial agency resources. This auditor is responsible for proposing the parameters of the audit and developing a plan of action and milestones to accomplish the audit. Included in the plan are the methodologies to be used, the staff and other resources required to conduct the audit, proposed staff member assignments, etc. When conducting the audit, the lead auditor makes on-site decisions and/or proposes major changes to managers on matters of significance in accomplishing the audit, including deviations from established policies and practices of the agency.

5 C.F.R. § 551.206(i). Based on this guidance, a team leader appears to be a staff member who leads by providing overarching direction to, but does not necessarily supervise, other employees in the company to perform an important task for the business. If Dependable's projects were nearly million dollar projects, it is likely that they constituted "major projects" for the purpose of the regulation. Whether each Plaintiff was a "team leader" will be addressed on a case-by-case

basis depending on whether they worked with a team of other Dependable employees and whether their role included developing a plan of action, implementing it, and deviating from established policies.

### b. Independent Judgment and Discretion

Defendants contend that Plaintiffs exercised independent judgment and discretion because they made assessments of what was needed on the project site and bought supplies for the projects. In addition, Defendants argue that Plaintiffs had the authority to waive or deviate from established policies without prior approval. Defendants note that Plaintiff Barlow had blank Dependable checks that he could use to purchase supplies. Further, Defendants argue that Plaintiffs exercised independent judgment and discretion because they served as a conduit between Dependable and other people in the sites including contractors, inspectors, landlords, customers, and vendors. Defendants contend that Plaintiffs "took care of lien waivers and did turnover when the project was complete." Plaintiffs allegedly all completed equipment lists and various punch lists, or a list of remaining construction tasks that remain near the end of a project. Again Defendants argue that Plaintiffs Barlow, Nudell, and Villegas' work on bids required independent judgment and discretion. Lastly, Defendants argue that Plaintiffs were the on-site representatives and were required to resolve grievances.

Plaintiffs contend that they did not exercise discretion with respect to matters of significance because they only decided whether specified standards had been met and made their decisions based on skill and experience. They argue that Dependable developed the construction schedule, approved the use of day labor, ordered equipment, approved expenses, and required notification of problems on the site.

Department of Labor regulations provide several factors to consider in determining whether the employee at issue exercised independent discretion and judgment:

1. whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices;
2. whether the employee carries out major assignments in conducting the operations of the business;
3. whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;
4. whether the employee has authority to commit the employer in matters that have significant financial impact;
5. whether the employee has authority to waive or deviate from established policies and procedures without prior approval;
6. whether the employee has authority to negotiate and bind the company on significant matters;
7. whether the employee investigates and resolves matters of significance on behalf of management;
8. and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R 541.202(b).

Federal courts generally find that employees who meet at least two or three of these factors are exercising discretion and independent judgment, although a case-by-case analysis is required. *See McKee v. CBF Corp.*, No. 08-10321, 2008 WL 4910671, *3 (5th Cir. Nov. 17, 2008) (upholding administrative exemption where employee supervised five others, screened employees for hire, decided which of a list of tasks would be handled by outside contractors, and ordered alcohol totaling over $500,000 per year); *Bondy v. City of Dallas*, 2003 WL 22316855, *2 (5th Cir. 2003) (upholding administrative exemption where event coordinators decided whether a client's proposal complied with policies and procedures, recommended that management excuse the noncompliance, and made suggestions to revise policies and procedures); *Cowart v. Ingalls Shipbuilding, Inc.*, 213 F.3d 261, 267 (5th Cir. 2000) (upholding administrative exemption where employees planned in detail all production work requirements in

the shipyard, ensured that craft workers had adequate information, established priorities for assigned work, and provided guidance to finish work on schedule).[6] *Cf Heidtman v. County of El Paso*, 171 F.3d 1038, 1042 (5th Cir. 1999) (reversing finding of administrative exemption where employees spent considerable time compiling names of prospects to complete their databases, calling prospects in these databases, sending them brochures, and the employees required permission to take potential clients out to a meal), *Roberts v. National Autotech, Inc.*, 192 F.Supp.2d 672, 679 (N.D. Tex. 2002) (holding employee's duties did not fall within administrative exemption where plaintiff handled customer complaints, ensured the store was running properly and profitably, scheduled employees, and oversaw daily operations, but could not grant vacation requests, deviate from normal refund procedures, or resolve serious internal disputes). In addition, final decision-making authority over matters of consequence is unnecessary. *See, e.g.*, *Tyler v. Union Oil Co. of California*, 304 F.3d 379, 403 (5th Cir. 2002).

In one recent FLSA case involving the construction industry, the court held that the employee was not administratively exempt because all of his activities needed to be approved by the project manager. *See Burns v. Blackhaw Management Corp.*, No. 4:05-cv-192TSL-LRA, 2008 WL 3822565, *3 (S.D. Miss. Aug. 12, 2008). For example, in determining whether the contractor's work was performed to specifications, the employee compared the work with the contract requirements, notified the manager if there were discrepancies, and the manager had sole authority to address any deviation. *See Burns*, 2008 WL at *4. In another recent case, the court found that plaintiff exercised no independent judgment and discretion because he had no authority to interview or hire new subcontractors, could not hire day laborers without the area

---

[6] *See also*, *Haywood v. North American Van Lines, Inc.*, 121 F.3d 1066, 1071-73 (7th Cir. 1997) (upholding administrative exemption where employee could negotiate on behalf of the employer with some degree of settlement authority, conduct independent investigation and resolution of issues without prior approval, and had the authority to waive or deviate from established policies and procedures without prior approval).

manager's permission and was given a list of subcontractors and supplies for each project. *Gottlieb v. Construction Services & Consultants, Inc., et al.*, No. 05-14139-Civ-Graham, 2006 U.S.Dist. Lexis 97446, *19 (S.D. Fla. July 20, 2006). The court found that the plaintiff's activities involved no more than "the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." 29 C.F.R. § 541.202(e) (distinguishing decisions that require independent discretion); *Gottlieb*, at *20.

An employee may exercise discretion even if his decisions or recommendations are reviewed by a senior management official and occasionally revised or reversed. *Cheatham v. Allstate Ins. Co.,* 465 F.3d 578, 585 (5th Cir. 2006); 29 C.F.R. § 541.202(c). In addition, employees may still exercise discretion and independent judgment even if they consult manuals or guidelines. *Id.* at 585.

### c. Applied to Individual Plaintiffs

All of the Plaintiffs earned more than $455/week for the entire relevant time period, an amount that was to cover all hours worked. In addition, Gregoire testifies via declaration that all Dependable employees were able to deviate from plans for certain items like the placement of walls or fire extinguishers. Similarly, Gregoire alleges that all Plaintiffs were able to resolve grievances. In the depositions provided, none of the Plaintiffs confirmed or denied that this was true for them while at Dependable. These conclusory statements, globally applied to all Plaintiffs, do not establish that all Plaintiffs deviated from company policies or resolved grievances such that they were administratively exempt as a matter of law.

### 1. Michael Villegas

In addition to significant manual labor, Villegas had some involvement with interviewing new workers at one site. At a K-Mart site in Wasco, California, Gregoire provided him a list of

people to interview from which Villegas recommended a particular worker, who was hired. (Doc. No. 50, Ex. A, 88:12-88:25; 91:1-92:2.) In addition, he was involved in the decision to bring on another worker, and to increase another's wages. (Doc. No. 50, Ex. A., 93:5-93:11; 93:16-93:25.) He relayed other employees' concerns about overtime. (Doc. No. 50, Ex. A, 97:16-97:24.) He often worked with Kent Nuddell, another Plaintiff, who was hired as a superintendent. According to Daily Reports filed by Villegas, they were occasionally the only Dependable employees at the site. (Doc. No. 50, Ex. K.)

On the job sites, Villegas made an assessment of what was needed and had the ability to purchase supplies. (Doc. No. 50, Ex. A, 106:12-107:7.) Further, on numerous occasions, he spoke on behalf of Dependable with customers and subcontractors. (Doc. No. 51, Ex. A, 155:6-155:21, 156:13-157:3, 157:15-157:23, 157:24-158:11, 158:22-159:5, 159:117-159:25, Ex. K-001620, K-001622, K-001689.) On one occasion, he placed 30 calls to different distributors to allow Dependable to put in a bid to remodel a client's cafeteria. (Doc. No. 50, Ex. B, 97:18-98:3.) Finally, he agrees that the superintendent's job description, *supra*, seemed like a fair description of his job. (Doc. No. 50, Ex. A, 113:23-114:6.)

Some of these activities might fall into the categories of non-manual work provided by the DOL regulations. *See* 29 C.F.R. § 541.201(b). Interviewing workers and providing recommendations to Dependable are activities related to personnel management. Apart from his purchases and his occasional interview of workers, his duties at Dependable, without further evidence, could be characterized as providing information to Gregoire and others who actively managed the company. For example, his role representing Dependable to subcontractors and customers may have primarily required him to relay information from them to Dependable to receive its feedback on the best course of action. *See, e.g.*, *Bratt v. County of Los Angeles*, 912

F.2d 1066, 1070 (9th Cir. 1990). On the other hand, if Villegas was in charge of ensuring that the contractor's work was properly performed, rather than simply performed on time, this constitutes quality control and is a management activity. It is not clear what authority Villegas had to address problems with the subcontractors or adjust company policy in order to meet their needs. While these activities suggest that Dependable may have properly classified Villegas as an administratively exempt employee, without more facts about the daily activities of the company and the frequency with which Villegas performed these tasks, the Court has insufficient evidence to conclude as a matter of law that Villegas was an administrative employee rather than a manual laborer whose primary duty did not include administrative or managerial tasks that related to the general business operations.

Defendants argue that all of the Plaintiffs are administratively exempt because many of them admitted in their depositions that they were "team leaders," who may be exempt if they supervise a "major project…even if the employee does not have direct supervisory responsibility over the other employees on the team." 29 C.F.R. § 541.203(c). Villegas, however, apart from the weeks he worked alone in Washington, was never the only person with a title of Foreman or Superintendent on a project  (Doc. No. 50, Ex. K.) Based on time sheets submitted, during late 2006 and most of 2007, for example, he worked with Nudell, a superintendent. *Id*. During 2006, he was often working with groups of up to six other Dependable employees but during this time he was a Foreman, and there was always at least one Superintendent on his worksite. *Id*. Based on this evidence, the Court cannot conclude as a matter of law that Villegas was a "team leader" such that he qualified for an administrative exemption.

Both Villegas' and Defendants' Motions should be denied as to Villegas' classification as an administrative employee. Because Defendants have not sustained their burden to prove that

Villegas' primary duty was the performance of non-manual work related to the general business, the Court will not reach the question of whether Villegas exercised independent judgment and discretion. Defendants have not argued that Villegas was exempt as an executive employee. Their arguments regarding the Motor Carrier Act exemption will be addressed below.

### 2. William Barlow

Barlow was the contact person for Dependable when subcontractors came onto the site. (Doc. No. 50, Ex. C, 65:4-65:7.) In addition, he "tried during [his] work to manage those [subcontractors] and just make sure they were doing their job right." (Doc. No. 50, Ex. C, 80:10-80:14; 83:16-83:25.) After work each day, he sent progress reports to the Dependable office, including assessments of subcontractors' performance. (Doc. No. 50, Ex. C, 91:3-91:12.) In addition, he performed manual labor including busting concrete, framing, hanging sheetrock, installing insulation, and pouring concrete, like the other laborers on the site. (Doc. No. 50, Ex. C, 79:21-80:9.)

At Dependable, he had some involvement with hiring and managing the subcontractors for the projects on which he worked. For example, he provided Gregoire and the senior project manager[7] his impressions of the subcontractor such as if he "felt confident with him;" sometimes Dependable would take Barlow's recommendation, other times not. (Doc. No. 50, Ex. C, 65:8-65:19; 66:4-66:11.) In addition, on two or three occasions, Barlow provided information to Dependable and, based on that information, Dependable gave the subcontractor a 24-hour notice of removal from the site. (Doc. No. 50, Ex. C, 67:16-68:9.) To his recollection, Barlow was involved in every incident when a subcontractor was removed from one of his projects. (Doc. No. 50, Ex. C, 68:16-68:24.) The Dependable office provided Barlow a flow chart with the dates to complete certain tasks on the job site, such as pouring concrete, and he would convey this

---

[7] The project manager's name is alternatively spelled "Stewart" or "Stuart" in depositions.

information to the relevant subcontractors by providing them a copy of the schedule. (Doc. No. 50, Ex. C., 84:9-85:7; 96:1-96:9.) If the subcontractor did not show up, he would let the Dependable office know, and it would decide what to do. (Doc. No. 50, Ex. C, 85:15-86:24.)

Barlow describes himself as the team leader for the majority of the time he worked at Dependable. (Doc. No. 54, Ex. L, 177:15-177:25.) Barlow ordered, or recommended that the office order, all of the tools, equipment and supplies for his projects. (Doc. No. 50, Ex. C, 78:8-78:11; Doc. No. 54, Ex. L, 71:11-71:22; 74:10-74:14.) Sometimes these requests were denied. (Doc. No. 54, Ex. L, 72:2-72:20.) Dependable provided him field checks to purchase these supplies, but they had to be cleared through Gregoire, and, at least once, Barlow's purchase request was denied. (Doc. No. 50, Ex. C, 97:7-97:25; 98:9-98:23.) In addition, he managed all the employees present, if any (typically three or fewer), and the temporary laborers, if any, during his shifts. (Doc. No. 50, Ex. C, 78:12-78:25; 79:4-79:9.) Most of the time, he was not supervising other Dependable employees, only day laborers and subcontractors. (Doc. No. 54, Ex. L, 63:5-63:20.) He relayed at least one e-mail from an employee who requested a raise; Barlow suggested it be granted, and it was. (Doc. No. 50, Ex. C, 173:11-173:23; 174:24-175:4.) Barlow had some involvement in moving employees off the job site. (Doc. No. 50, Ex. C, 88:23-89:8.) In addition, he spoke to customer representatives on behalf of Dependable about progress on the site. (Doc. No. 50, Ex. C, 95:18-95:25.) At one point he advised the architect on a project that the doors were in the wrong place in the plan, and Barlow's advice was taken such that the doors were moved. (Doc. No. 50, Ex. T ¶ 17.)

Again, it is not clear if Barlow's primary role was to provide Dependable information that it could use to make general business decisions. Barlow explained that Dependable provided him a flow chart with the dates to complete certain tasks on the job site, and he had to wait for

Dependable's response before deciding what to do if a subcontractor did not show up. He had some involvement with personnel decisions including hiring and managing the subcontractors for the projects on which he worked. Barlow had some involvement with procurement: he ordered, or recommended that the office order, all of the tools, equipment and supplies for his projects. These isolated activities in addition to his procurement activities, however, without more, do not establish that Barlow's primary duty was servicing the business such that he qualifies for an administrative exemption.

Barlow describes himself as the team leader the majority of the time he worked at Dependable. Unlike Villegas, Barlow was often the highest ranked Dependable employee as demonstrated by the timesheets submitted that cover time periods from July 2005 through the end of his time at Dependable in June 2007. (Doc. No. 50, Ex. M.) But, he claims that most of the time, he was not supervising other Dependable employees, only day laborers and subcontractors. The time sheets support Barlow's claim: he was often the only Dependable employee on the site or worked with just one other person. *Id*. For two periods, totaling approximately seven months, from August 2006 through early November 2006, and in April through late June 2007, Barlow worked with at least two other Dependable employees. *Id*. Given that Barlow worked for Dependable for over two years, this "team leader" position comprises a small portion of time during his tenure. In addition, without further evidence about his duties and the amount of time spent performing them, the Court cannot conclude that he was a team leader for purposes of the administrative exemption. Defendants' Motion and Barlow's should be denied as to the administrative exemption.

### 3. John Beltran

There is not much evidence regarding John Beltran. He took trips to Home Depot to purchase supplies for Dependable. (Doc. No. 50, Ex. P-004336, P-004341, P-004344, P-003247.) These facts are insufficient to prove that he should be administratively exempt.

According to time sheets provided, John Beltran generally worked as a carpenter foreman under Robert Beltran, a superintendent, and so cannot be characterized as a team leader such that he is administratively exempt. (Doc. No. 50, Ex. O.) Defendants' Motion and John Beltran's should be denied as to John Beltran's status as an administrative employee.

### 4. Robert E. Beltran

Robert Beltran admits that he was the team leader of two Dependable projects. (Doc. No. 50, Ex. D, 44:10-44:12.) During much of his time at Dependable, two Dependable employees worked with him as well as some temporary laborers. (Doc. No. 50, Ex. D, 45:3-45:19; 45:20-45:25; 46:3-46:8; 46:15-46:24.) He also alleges that they were all part of an equal team, and he was not supervising them. (Doc. No. 50, Ex. D, 44:13-44:19.) Daily Job Reports for that period list him as the superintendent along with combinations of superintendents, former-Plaintiff Jimmy Beltran, Plaintiff John Beltran (listed as a superintendent on some forms and a foreman on others), and Jason Ambrose. (Doc. No. 50, Ex. O.) On one project in Ohio, Robert Beltran discovered that the design of the store bulkhead differed from what was built. He worked with the architect to design a method to overcome the differences. (Doc. No. 50, Ex. T ¶ 17.)   Again, without further evidence, the fact that Robert Beltran purchased supplies for the projects on which he worked and once worked with the architect to develop a solution to a problem are insufficient to prove that he should be administratively exempt. At one point in his deposition, Robert Beltran admitted that he was the team leader on the projects for which he worked, but then explained that none of the other employees was working under him. A team leader need not

have direct supervisory control of the employees with whom he works. However, without more information about Robert Beltran's primary duty for Dependable, Defendants' Motion and Robert Beltran's should be denied as to the administrative exemption.

### 5. Carl Edward Beltz

While working,  Beltz spoke to visitors on the site, including subcontractors, on behalf of Dependable. (Doc. No. 50, Ex. E, 49:18-49:20, Doc. No. 50, Ex. Q-004155-Q-004156.) He purchased equipment necessary for the job. (Doc. No. 50, Ex. E, 50:24-51:4.)  He admits that he was the team leader for at least one of the projects on which he worked (Doc. No. 50, Ex. E, 53:9-53:15.) On behalf of Dependable, he drove to Corpus Christi and Seekonk, Massachusetts. (Doc. No. 50, Ex. Q-004208, Q-004151, Q-004145, Q-004171, Q-004196.)

Like the other Plaintiffs, Beltz was the "representative" when contractors and other visitors came on site. As discussed above regarding Villegas and Barlow, it is unclear whether his role as "representative" was one that included independent authority to make decisions or was only one of information gathering for Gregoire and the other members of Dependable's administrative office.

Beltz admits that he was the team leader onsite. His time sheets demonstrate, however, that he was frequently working with only one other Dependable employee—thus, he could not be a team leader. (Doc. No. 50, Ex. Q.)  Defendants' Motion and Beltz's should be denied as to the administrative exemption.

### 6. David Garcia

Garcia filled out the Daily Job Reports for this site, and he primarily worked with former Plaintiff Juan Beltran. (Doc. No. 50, Ex. R- 004097-00101.) He claims that, on his job sites, Plaintiff Barlow was the supervisor. Barlow's name does not appear, however, on the Field Time

Sheets provided, and Garcia signed as superintendent on these sheets. (Doc. No. 50, Ex. F, 16:8-17:1, 17:9-17:11, Ex. Q.) Based on the facts provided, Garcia may qualify as administratively exempt because he admitted he was a team leader, and had the authority to purchase supplies for the projects on which he worked. Without more evidence about his day to day work and his primary duty, in addition to the unresolved fact question of whether Barlow supervised his projects, Defendants' Motion and Garcia's should be denied as to his administrative exemption.

### 7. William Forest Parsons

In this position, Parsons had some discretion to work out problems on the site. (Doc. No. 50, Ex. N-003444.) He appeared to have some involvement with bidding. (Doc. No. 50, Ex. N-003632, N-003405.) Again, there are very few factual allegations regarding Parsons. Defendants argue that their Motion should be granted as to Parsons because he did not submit to a deposition and therefore, apart from his declaration, discussed, *supra*, there is little in the record.  Plaintiffs respond that the parties could not agree on dates for the depositions and that Parsons was never noticed for a deposition that he failed to attend. At this time, the Court will not dismiss Parsons from the case. Still, because of the paucity of the record, it will deny both parties' Motions as to the administrative exemption.

### 8. Kent Nudell

Nudell described his role as leading the team in the field, because he was ultimately responsible if the work did not get done. He admitted that no one at the project site "provided more supervision and management," although he worked all day long beside them performing manual labor. (Nudell Dep., Doc. No. 50, Ex. B, 25:6-25:15, 30:19-31:1; Doc. No. 54, Ex. K, 33:7-33:14.)

Nudell provided daily reports to Dependable regarding progress on the job sites, including the progress of other Dependable personnel. (Doc No. 50, Ex. B, 19:13-20:8.) If he reported that a group was not doing its job, Dependable took them off the job. (Doc. No. 50, Ex. B, 20:22-21:1, 26:16-26:22; 97:1-97:17.) He ensured that the work was done in a timely and appropriate fashion. (Doc. No. 50, Ex. B, 26:4-26:6.) He spoke with customers, site inspectors, and job vendors on behalf of Dependable. (Doc. No. 50, Ex. B, 33:7-33:14, 36:23-37:23, 85:4-85:6, 85:21-86:24, 87:22-88:2, 88:11-88:17, 90:15-91:91, 92:13-92:16, 95:1-95:9, 98:4-98:13.) Near the end of work on a job site, either he, Gregoire, or the senior project manager[8] would create a punch list of tasks to be completed before the site was turned over to the owner. (Doc. No. 50, Ex. B, 93:9-94:10.) In addition, at least once when a project was finished, he coordinated with the district manager for the client to ensure the transfer of the site back to the client. (Doc. No. 50, Ex. B, 99:2-99:17.)

He made recommendations about contractors that he interviewed, and the Dependable office generally followed these recommendations, although not always. (Doc. No. 50, Ex. B, 21:15-22:21, 28:13-28:19, 29:17-29:29; Doc. No. 54, Ex. L, 22:14-23:21.) In general, Dependable followed his suggestions regarding the projects. (Doc. No. 50, Ex. B, 34:19-34:24.)

Nudell performed many tasks that could be administrative. He represented Dependable to visitors, purchased supplies, ensured that the work was completed in a "timely and appropriate" fashion, provided daily progress reports, and reported to Dependable if a contractor was not performing properly. Again, it is not clear if Nudell's primary role was to provide Dependable information that it could use to make general business decisions. As discussed below, he did not lead a team of other Dependable employees more than half the time he worked for it. On the Dollar Tree project in California, Nudell allegedly worked with the Dependable Project Manager

---

[8] His name is alternatively spelled Stewart or Stuart in depositions.

and the customer's architect to design a method of overcoming structural cross-bracing hindering the finished product. (Doc. No. 50, Ex. T.) Without more evidence of the frequency with which he performed these roles and how much independent judgment and discretion he exercised while performing them, Defendants' Motion and Nudell's should be denied as to the administrative exemption.

### 2. Executive Exemption

Defendants argue that Barlow, Nudell, and Robert Beltran qualify for the executive exemption. Plaintiffs argue that they did not manage a "recognized department or subdivision," as required under the regulations, because Dependable's project sites constituted only a collection of employees, contractors and temporary workers. Further, they argue that Plaintiffs did not manage two or more employees more than seventy percent of the time because there was rarely more than one Dependable employee on a project site. In addition, they argue that Plaintiffs' recommendations regarding hiring and firing decisions were infrequent and therefore not given particular weight as defined by the regulations.

Defendants contend that the Plaintiffs had a primary duty of supervising the activities of the construction project, including directing employees and contractors, meeting with client representatives, making purchasing decisions, completing daily reports, and making recommendations regarding the terms and conditions of some employees' employment. They also argue that an employee's exempt status is not vulnerable to employee turnover and contend that the analysis of the amount of time spent on supervision should be conducted on a project-by-project basis. Further, they argue that the percentage of time spent on supervision should be calculated based on the FLSA claim period rather than the entire time of employment.

### a. Primary duty is the management of a customarily recognized department or subdivision

28

Management of the enterprise includes:

activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

The management of "a customarily recognized department or subdivision" is intended to distinguish between a "collection of employees assigned from time to time to a specific job or series of jobs and a unit with permanent status and function. A customarily recognized department or subdivision must have a permanent status and a continuing function. For example, a large employer's human resources department might have subdivisions for labor relations, pensions and other benefits, equal employment opportunity, and personnel management, each of which has a permanent status and function." 29 C.F.R. § 541.103. A recognized department or subdivision may move from place to place and the subordinate personnel may change, as long as the "unit" has a continuing function. 29 C.F.R. § 541.103(c)-(d).

Dependable's projects are a recognized department or subdivision of the business. For example, in an Opinion Letter, the Department of Labor clarified that a project superintendent who supervises the day-to-day activities of construction projects qualifies as an executive. U.S. Dept. of Labor Administrator Paul DeCamp, FLSA2007-3 (Jan. 25, 2007). The Administrator did not discuss whether the construction project was a "customarily recognized department or subdivision," but its lack of discussion, combined with the Administrator's finding that the

employee was exempt, suggests that a construction project is a subdivision for purposes of FLSA. Further, in a case where a supervisor managed one of several ongoing construction projects for an employer, he may qualify as an exempt executive who manages a recognized unit with a continuing function. *See Sutton v. Engineered Systems, Inc.*, 598 F.2d 1134, 1137 (8th Cir. 1979) (holding that 480-day, $700,000 construction project was a recognized unit); *Cobb v. Finest Foods, Inc.*, 755 F.2d 1148, 1150 (5th Cir. 1985) (holding that an employee who manages the hot foods section of various cafeterias was exempt in part because the sections were recognized subdivisions of the cafeterias).

### b. Employee must customarily and regularly direct the work of two or more other employees

Executive employees make suggestions and recommendations regarding employees whom the executive "customarily and regularly directs." 29 C.F.R. § 541.105. Customarily and regularly includes "work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." 29 C.F.R. § 541.701. Contractors, subcontractors, and temporary workers are not considered for this test. 29 C.F.R. § 541.104(a); 69 Fed. Reg. 22121, 22135 (Apr. 23, 2004). Courts agree that "customarily and regularly" is more than 70 percent, but may be less than 100 percent of an employee's time. *See Perez v. Radioshack Corp.*, 386 F.Supp.2d 979, 990 (N.D.Ill. 2005) (citing cases from the First, Eighth, and Seventh Circuits); *Kastor v. Sam's Wholesale Club,* 131 F.Supp.2d 862, 869 (N.D.Tex. 2001) (70-75 percent of an employee's time is "customarily and regularly").

Defendant argues that the percentage of time spent supervising two or more employees should be calculated on a project-by-project basis. For example, in determining standards for certifying a FLSA case, a court held that, because employees moved from store to store, the percentage of time should be calculated on a store-by-store basis for any employee who worked

at any Radioshack store more than 105 days. *See  Perez v. Radioshack Corp.*, No. 02-C-7884, 2006 U.S. Dist. LEXIS 21574, *6, *17 (N.D.Ill. Apr. 6, 2006). The Dependable projects generally last fewer than 15 weeks. As noted above, Defendants argue that the employees were part of a recognized subdivision of the company, suggesting that the Plaintiffs had a permanently managed subdivision within the company, even though Plaintiffs moved from project to project with different employees. Consequently, it is difficult to justify calculating time spent supervising on a project-by-project basis, treating the projects as distinct subdivisions. Defendants next argue that calculating time otherwise renders Plaintiffs' exempt status vulnerable to employee turnover or other employment variables. These employee variables, as discussed by other courts, include frequent turnover of low-level employees, a downturn at a particular company, and the bankers' hours exception for industries where full-time employees customarily work fewer than 40 hours per week. *Perez v. Radioshack*, 386 F.Supp.2d at 990-91. None of these variables will affect the calculation of Plaintiffs' time spent supervising other employees. Therefore, the Court will calculate the percentage of time spent supervising based on the FLSA claim period.

### c. Employee must have the authority to hire or fire other employees or his recommendations must be given particular weight

To determine whether an employee's suggestions and recommendations are given 'particular weight,' factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

31

29 C.F.R. § 541.105.

Further, an employee may perform exempt and non-exempt work and still qualify for the exemption. "[E]xempt executives make the decision regarding when to perform nonexempt duties … [I]n contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods." 29 C.F.R. § 541.106(a).

### d. As applied to particular Plaintiffs

#### 1. Barlow

Plaintiffs argue that Barlow only made two personnel suggestions in his four years at Dependable: one suggestion to transfer an employee and once he informed Dependable that another employee wanted a raise. Barlow did make suggestions and recommendations regarding contractors, but the suggestions must relate to Dependable employees in order to be relevant to the determination of Barlow's exemption. 29 C.F.R. § 541.105. These infrequent suggestions are insufficient to conclude, without more, that Barlow's suggestions were entitled to particular weight.

In addition, for the purposes of calculating the time Barlow spent supervising two or more other full time employees, the Court will first assume that only a non-willful violation may be proved (see discussion, Section V.5, *infra*). Thus, the possible claim period begins two years prior to the date of filing of the lawsuit, or July 5, 2005. Barlow worked at Dependable until July 1, 2007. Based on calculations using the time sheets provided, Barlow worked at most 30 weeks with two or more other Dependable employees. (Doc. No. 50, Ex. M.) Defendants concede that he spent 22 of 104 weeks supervising. Under either calculation, this does not constitute 70 percent of his time.

Further, reviewing the list of management activities, it is also not clear how significantly he was involved with the activities. He once relayed information regarding an employee's complaints and grievance, and he may have disciplined one employee by transferring him off site. Given that he purchased tools for his projects, he likely controlled the flow and distribution of materials or merchandise and supplies onsite. He also was the representative when the inspectors were on site to ensure legal compliance and therefore monitored some legal compliance measures. Without further evidence of the frequency and importance of Barlow's management activities, Defendants have not met their burden to establish that these activities were Barlow's primary duty. In addition to the infrequency of supervision, the infrequency of his suggestions regarding advancement and hiring, and the uncertainty regarding the importance of his management activities, the Court cannot conclude as a matter of law that Barlow is properly classified as an executive employee. Both parties' Motions have to be denied as to this exemption.

## 2. Robert Beltran

Plaintiffs do not dispute Defendants' contention that Robert Beltran customarily and regularly supervised two more Dependable employees. Defendants contend that Beltran recommended that other Dependable employees be hired: John Beltran, Jimmy Beltran, and David Garcia. Plaintiffs respond that these employees were hired within two weeks of Robert Beltran's hire, and he was not yet a superintendent. Without other evidence of influence as to hiring and firing, Defendants have not met their burden as to the second prong of the executive exemption. Further, the evidence from Robert Beltran is too sparse to conclude as a matter of law that his primary duties included managerial roles such that he was properly classified as an

executive employee. Both parties' Motions should be denied as to Robert Beltran's classification as an executive employee.

### 3. Nudell

Nudell worked for Dependable from February 22, 2006 through May 25, 2007, just over 65 weeks. Defendants claim that he supervised two or more Dependable employees from August 10, 2006 through January 5, 2007. Assuming this is true, Nudell supervised employees for 21 weeks of the 65 weeks he worked for Dependable within the claim period. This is less than 70 percent of the time that he spent at Dependable.

Defendants claim that Nudell made suggestions that two employees he interviewed should be hired because he put stars in the corner of their resumes to suggest his approval. Again, without other evidence of suggestions regarding hiring and firing, Defendants have not met their burden as to the fourth prong of the executive exemption.

Further, reviewing the list of management activities, it is also not clear how significantly Nudell was involved with the activities. He did determine the types of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold and likely controlled the flow and distribution of materials or merchandise and supplies. He also was the representative when the inspectors were on site to ensure legal compliance. Without further evidence, however, Defendants have not met their burden to establish that these activities were Nudell's primary duty. In addition to the infrequency of supervision, the infrequency of his suggestions regarding advancement and hiring, and the uncertainty regarding the importance of his management activities, the Court cannot conclude as a matter of law that Nudell was properly classified as an executive employee. Both parties' Motions should be denied as to Robert Beltran's classification as an executive employee.

### 3. Combination Exemption

Defendants argue that Plaintiffs may be exempt under the combination exemption. This exemption allows an employer to prove that an employee is exempt if he performs a combination of administrative and executive duties, and his primary duty fits neatly into neither exemption. 29 C.F.R. § 541.708. The Secretary has recently interpreted this exemption as "a mechanism for cobbling together different exempt duties for purposes of meeting the primary-duty test." *See IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 294 (4th Cir. 2007). The exemption, however, does not relieve the employees of independently establishing the requirements of each exemption that is claimed. *See Id*. "In other words, work that is exempt under one section of this part will not defeat the exemption under any other section." 29 C.F.R. § 541.708. Where, as here, it is not clear that any of the employees had exempt work, under either category, as their primary duty, the combination exemption cannot apply. *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1232 (5th Cir. 1990).

### 4. Motor Carrier Act Exemption

FLSA has an exemption to its overtime requirements for employees who are subject to the jurisdiction of the Secretary of Transportation. 29 U.S.C. § 213(b). The Secretary has jurisdiction to regulate the maximum hours of service for employees of private motor carriers who transport property between states. 49 U.S.C. § 13501.

Defendants argues that all Plaintiffs were exempt under the Motor Carrier Act exemption. Plaintiffs respond that Defendants' evidence is conclusory, global, and lacks any foundation. They further contend that it is difficult to tell from records produced which employee drove a truck in interstate commerce because oftentimes two Plaintiffs worked together and, occasionally, a Plaintiff flew to a job site rather than drove.

### a.  Does Dependable qualify as a "motor private carrier" prior to August 10, 2006?

The Motor Carrier Act grants regulatory authority to the Secretary of Transportation over certain categories of employees.   In the present case, Defendants argue that Plaintiffs are employees of a motor private carrier, a category covered by the Act.   ("The Secretary of Transportation may prescribe requirements for 49 U.S.C. § 31502(b)(2) qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation.").

The Motor Carrier Act was amended in 2005 to cover only commercial vehicles that weigh more than 10,000 pounds. Safe Accountable Flexible Efficient Transportation Equity Act, A Legacy for Users ("SAFETEA-LU"), Pub. L. No. 109-59, 119 Stat. 1728 (Aug. 10, 2005). Congress later amended the Act to clarify that an employer shall not be liable under FLSA if the violation occurred in the one-year period beginning August 10, 2005, if the employer did not have actual knowledge that the employer was subject to its requirements with respect to the covered employee. SAFETEA-LU Technical Corrections Act of 2008, Pub. L. No. 110-244 § 306, 122 Stat. 1572, 1620 (2008).[9] All Plaintiffs worked at Dependable prior to August 10, 2006.

The Motor Carrier Act defines a "motor private carrier" as "a person, other than a motor carrier, transporting property by commercial motor vehicle (as defined in section 31132) when (A) the transportation is as provided in section 13501 of this title [essentially, the transportation is interstate]; (B) the person is the owner, lessee, or bailee of the property being transported; and (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial

---

[9] At the same time, the Technical Corrections Act contains other statutory language that Congress intended § 305, restoring the MCA definitions to their pre-SAFETEA-LU versions, to apply retroactively. Pub. L. No. 110-244 § 121(a). Section 121 explains that each provision of the SAFETEA-LU amended by the Technical Corrections Act "shall be treated as not being enacted." It is not clear that § 305 was intended to amend the SAFETEA-LU; rather, it may have amended the underlying Motor Carrier Act. As this Court must presume that the all words of statutes are intended to have meaning, the Court will conclude that § 305 does not apply retroactively, and § 306 provides a one-year defense to liability.

enterprise." 49 U.S.C. § 13102(15). Because the test is conjunctive, Dependable must satisfy each of the requirements.

Defendants argue that 1) the equipment and tools carried by Dependable employees, including Plaintiffs, constitute "property" under the Motor Carrier Act; 2) the property is carried in interstate commerce, because most of the equipment originates out-of-state and because Plaintiffs carried it (or could have been called upon to carry it) across state lines; 3) Dependable owns the property being transported; and 4) the property is being transported to further a commercial enterprise. Only the first and second contentions are in dispute; Plaintiffs assert that there is insufficient evidence to prove that they made interstate trips with Dependable's property.

As to the first contention, a 2005 DOL letter clarified that Medical Equipment Installation Technicians qualify for the Motor Carrier Exemption. U.S. Dept. of Labor Deputy Administrator Alfred B. Robinson, Jr., FLSA2005-27 (Aug. 26, 2005). The installers provide installation and de-installation services for hospitals and offices that use medical technology. *Id.* The installers transported toolboxes and other equipment for installation. *Id.* The Deputy Administrator found that the tools and equipment were "property" transported in interstate commerce, used in furtherance of a commercial enterprise. *Id.* In addition, the installers, because they drove a vehicle in interstate commerce, affected the safety of operation of motor vehicles in the transportation on the public highways. *Id.* Consequently, the installers qualified as FLSA-exempt under the MCA exemption. Dependable's tools are likewise "property" for purposes of the MCA.

As to the second contention, the Court notes that any equipment originating out-of-state, regardless of whether Plaintiffs themselves carried it to another state, must be defined as moving in interstate commerce for the purposes of the motor carrier exemption. *See, e.g.*, *Merchants*

37

*Fast Motor Lines, Inc. v. ICC*, 528 F.2d 1042, 1044 (5th Cir. 1976) ("It is elemental that a carrier is engaged in interstate commerce when transporting goods either originating in transit from beyond Texas or ultimately bound for destinations beyond Texas, even though the route of the particular carrier is wholly within one state. Traffic need not physically cross state lines to be in interstate commerce, if the goods carried are in the course of through transit."); *Galbreath v. Gulf Oil Corp.*, 413 F.2d 941 (5th Cir. 1969) (holding that petroleum products shipped from out-of-state, on the basis of contractual commitments with consumers, and temporarily stored at a bulk plant were moving in interstate commerce); 29 C.F.R. § 782.7 ("The result is no different where the vehicles do not actually cross State lines but operate solely within a single State, if what is being transported is actually moving in interstate commerce within the meaning of both acts; the fact that other carriers transport it out of or into the State is not material.") (citations omitted).

Therefore, Dependable qualified as a motor private carrier not only when the Plaintiffs drove to another state (as long as they were carrying some property owned by Dependable in furtherance of a commercial enterprise), but also whenever the Plaintiffs carried any equipment that originated out-of-state, either within a state on their frequent trips to Home Depot or other locations, or across state lines.  In the Court's view, Defendants have sufficiently demonstrated that Dependable qualified as a motor private carrier.

### b. Did Plaintiffs perform work that affected transportation safety?

Not every employee of a motor private carrier will fall under the motor carrier exemption, which "depends both on the class to which [an] employer belongs *and on the class of work involved in the employee's job.*"  29 C.F.R. § 782.2(a) (emphasis added).  To be exempt, an employee must "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in

38

interstate or foreign commerce within the meaning of the Motor Carrier Act." *Id.*; *see also Levinson v. Spector Motor Serv.*, 330 U.S. 649, 671 (1947) ("The fundamental test is simply that the employee's activities affect safety of operation."); *United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 553 (1940) ("the meaning of employees . . . is limited to those employees whose activities affect the safety of operation").

In claiming the exemption, Defendants argue that Plaintiffs acted as drivers in interstate commerce whenever they traveled to projects with Dependable's tools. Indeed, drivers are one of the classes of employees to whom the exemption is most often applied, since driving has a direct and discernible effect on the safety of interstate transportation. *See* 29 C.F.R. § 782.2(b)(2) ("The exemption is applicable . . . to those employees and those only whose work involves engagement in activities consisting wholly or in part of a class of work which is defined: (i) As that of a driver, driver's helper, loader, or mechanic . . ."); *id.* at § 782.3(b) ("The work of an employee who is a full-duty or partial-duty 'driver' . . . directly affects 'safety of operation' within the meaning of section 204 of the Motor Carrier Act . . ."); *Levinson*, 330 U.S. at 678 ("the driver's work more obviously and dramatically affects the safety of operation of the carrier during every moment that he is driving . . .").

Plaintiffs drove only incident to their construction duties. The Supreme Court has articulated what has come to be known as a *de minimis* rule in evaluating the status of an employee whose duties only partially affect safety of operation.  If the "whole or a substantial part" of an employee's activities affects the safety of operation of vehicles in interstate commerce, then those employees are exempt from overtime wage protection under the FLSA. On the other hand, "[i]f some, but less than a substantial part, of such activities of the respective respondents . . . come within the kind of activities which, according to the Commission, affect

such safety of operation," then those employees may still receive overtime wages. *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695, 708-09 (1947); *see also Levinson*, 330 U.S. at 682 (applying the "substantial part" test in finding that petitioner qualified as a loader, and was thus exempt from the overtime provision of the FLSA). The Fifth Circuit has employed the *Pyramid* de minimis analysis on numerous occasions, including one case involving driving activities. *See Wirtz v. C&P Shoe Corp.*, 336 F.2d 21, 29-30 (5th Cir. 1964) (holding that three employees who drove occasionally, but not as their primary job, fell within the *Pyramid* rule). In *Wirtz*, "one employee said he drove once or twice a month, another had driven three times in approximately two years, and the third made the trip about "twice or so" while the regular driver was out of the state because of family trouble." *Wirtz*, 336 F.2d at 30. Similarly, where a mechanic helped prepare a tractor trailer for interstate commerce sixteen times in one year, this was considered *de minimis*. *See Wirtz v. Tyler Pipe & Foundry Co.*, 369 F.2d 927, 930 (5th Cir. 1966). In addition, where fewer than 0.23 percent of deliveries were interstate deliveries, the exemption did not apply. *See Coleman v. Jiffy June Farms, Inc.*, 324 F.Supp. 664, 670 (S.D. Ala. 1970), *aff'd* 458 F.2d 1139 (5th Cir. 1972).

Courts have, however, applied the exemption to employees who were not primarily occupied as drivers, or who did not spend a majority of their time driving in interstate state commerce. *See, e.g.*, *Morris v. McComb*, 332 U.S. 422 (1947) (holding that the overtime requirements of the FLSA did not apply to drivers and mechanics employed by a carrier whose interstate business was only three to four percent of its total business); *Sinclair v. Beacon Gasoline Co.*, 447 F. Supp. 5 (W.D. La. 1976), *aff'd*, 571 F.2d 978 (5th Cir. 1978) (applying the motor carrier exemption to "field men" whose duties included carrying tools and parts to perform well repairs in several states). Subsequently, the Fifth Circuit has moved away from the *de*

*minimis* test for drivers whose work only rarely involved interstate deliveries. *See   Barefoot v. Mid-America Dairymen, Inc.*, 16 F.3d 1216 (5th Cir. 1994) (unpublished) (explaining that it is "the character of the activities, rather than the proportion of the employee's time or of his activities" that determines jurisdiction under the MCA) (quoting *Morris v. McComb*, 332 U.S. at 431); *Sinclair*, 447 F. Supp. at 11 (citing a First Circuit case in opining that "the *de minimis* rule should seldom, if ever, be applied to one who drives a motor vehicle carrying property of a private carrier in interstate commerce"). In light of the cited case law and the DOL's 2005 Opinion Letter regarding the installers, *supra*, the Court finds it likely that, if there is evidence of frequent interstate trips wherein each Plaintiff drove Dependable's tools to job sites, he would qualify as exempt under the MCA.

### c. As Applied to Each Plaintiff

Plaintiffs therefore qualify as FLSA-exempt under the MCA to the extent that they drove Dependable tools in interstate commerce during the period from July 5, 2005, until August 10, 2006. Plaintiffs have not disputed the particular logs cited by Defendants with evidence that many of the Plaintiffs had trailers with Dependable tools and mileage reports that Plaintiffs drove to many different states to complete their projects. Some of the evidence includes driving trips after August 10, 2006, and will not be included in the analysis below. Gregoire alleges that Villegas, Barlow, John Beltran, and Parsons routinely hauled a Dependable trailer, with Dependable tools, to different project sites around the country. (Doc. No. 50, Ex. T ¶ 5.) While Nudell was assigned the trailer, it was attached to Villegas' truck. *Id*. In addition, Nudell, Beltz, Garcia, and Robert Beltran drove their personal vehicles with Dependable tools to project sites. *Id*.

Specifically, Nudell and Villegas each had a trailer with many Dependable tools, many purchased before August 10, 2006. (Doc. No. 50, Ex. L-00079; Doc. No. 61, Ex. B-00081; Nudell Dep., Doc. No. 61, Ex. A, 14:2-14:25.) Plaintiffs claim that there is no evidence as to which Plaintiff actually drove the tools to the job. Nudell drove to project sites with a fifth-wheel camper, and Plaintiffs do not specifically contest Gregoire's allegation that Nudell also carried Dependable tools in his personal truck to his project sites. Prior to August 10, 2006, Villegas and Nudell worked on projects in many states, and according to Gregoire, drove to the projects. (Doc. No. 50, Exs. K, L.) When Nudell quit, they had to return his trailer of tools. (Doc. No. 61, Ex. A, 14:2-14:6.) Defendants' Motion will be granted as to Villegas and Nudell for the MCA exemption from the beginning of their time at Dependable until August 10, 2006.

Gregoire claims that Barlow had a trailer with Dependable tools. Plaintiffs respond that there is no evidence that Barlow was transporting tools. According to Dependable paperwork, he had a trailer with Dependable tools because a sheet with his name listed one of his activities as "inventory trailer." (Doc. No. 50, Ex. M-00002.) In a Daily Report, Barlow reported that he "packed trailer and loaded tools." (Doc. No. 61, Ex B-00370.) At the end of his tenure at Dependable, Barlow returned a trailer with tools. Barlow drove to projects in New Jersey, Maine, Ohio, and New Hampshire. (Doc. No. 50, Ex. M-00003, M-00015, M-00005.) Construing all evidence in the light most favorable to the non-moving party, however, it is possible that these trailer activities were sporadic and the only times that Barlow transported Dependable tools. Defendants' Motion will be denied as to Barlow for the MCA exemption from the beginning of his time at Dependable until August 10, 2006.

Parsons drove a trailer of tools to projects in Maine and New York. (Doc. No. 50, Ex. N-03609, N-03636.) He frequently drove to projects around the country. (Doc. No 50, Ex. N-

03851, N-03770, N-03801, N-03876.) Plaintiffs have not refuted Gregoire's contention that Parsons regularly carried a trailer on his travels. Defendant's Motion is granted as to Parsons for the MCA exemption from the beginning of his time at Dependable until August 10, 2006.

Plaintiffs argue that, because Robert and John Beltran frequently worked together, it was unclear who drove the trailer with the Dependable tools. Dependable produced a field mileage log, signed by Robert Beltran that listed John Beltran as the field employee, that listed the reason for the trip as "pull trailer to Columbus." (Doc. No. 50, Ex. P-04357.) Defendants provide another field log filled out by John Beltran and signed by Robert Beltran that provides the reason for the trip as "material." (Doc. No. 61, Ex. B-04374.) The standard of narrow construction of FLSA exemptions, however, suggests that a more substantial proffer of evidence is called for. As already noted, it is Defendant's burden to prove that any exemption to the FLSA applies. Defendant's Motion should be denied as to the claim that the MCA applies to John and Robert Beltran.

Plaintiffs admit that Beltz drove a trailer on one job. (Doc. No. 54, ¶ 75.) Beltz only worked at Dependable for two weeks and, in this time, he drove to projects in Massachusetts and Maine, and back to Texas. Even if he only drove a trailer on one of the two trips across the country, this is sufficient for purposes of the MCA. Defendants' Motion should be granted as to its claim that the MCA applies to Beltz.

Plaintiffs argue that Garcia flew to job sites rather than drove. (Doc. No. 54, Ex. N, 47:19-48:13.) Defendants do not provide any conclusive evidence that Garcia drove anywhere with Dependable tools. They do present evidence of receipts from tools he purchased, but then claim, without evidence, that Garcia transported those items to future job sites. (Doc. No. 61, at 13.) Defendants' Motion should be denied as to the claim that the MCA applies to David Garcia.

In discussing the FLSA, the Supreme Court has written that "[t]o extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretive process and to frustrate the announced will of the people." *A.H. Phillips, Inc., v. Walling*, 324 U.S. 490, 493 (1945). To the extent that evidence adduced at trial may affect the motor carrier exemption analysis, Defendants' exemption argument may again be urged. At present, however, the Court cannot find that Defendants have demonstrated as a matter of law that all Plaintiffs are exempt from the overtime provision of the FLSA.

### 5. Willfulness

#### a. Standard

Plaintiffs argue that Defendants willfully violated the FLSA. The plaintiff bears the burden of establishing that defendant's conduct was willful in making the initial salary decision. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 (1988); *Cox v. Brookshire Grocery Co.*, 919 F.2d 354, 356 (5th Cir. 1990). Willfulness is established when "that the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin*, 486 U.S. at 133.

#### b. Analysis

Defendants argue that any violations of FLSA were not willful because Defendants' classifications were based on reasonable grounds that the FLSA was not being violated. Defendants allegedly relied in good faith on Administaff's classifications of its workers. In addition, Defendants contend that none of the Plaintiffs complained to Dependable that they should receive overtime compensation even though they were aware of Dependable's complaint procedure.

44

Plaintiffs reply that the violations were willful because Gregoire was in charge of the day-to-day operations of Dependable and was aware of the FLSA requirements for overtime. Further, they claim that Dependable changed its method of paying its employees only after it settled with thirteen different former employees who sued Dependable for FLSA overtime violations in 2006. In addition, Plaintiffs contend that Gregoire subsequently filed suits in small claims court in retaliation for that FLSA lawsuit.

Evidence of willfulness includes admissions from management that they knew they were violating FLSA prior to the lawsuit. *See Singer v. City of Waco*, *Tex.*, 324 F.3d 813, 821-22 (5th Cir. 2003). A violation is willful if an employer continued a practice without further investigation after it was informed by the Wage and Hour office that its payment method violated FLSA. *See Reich v. Bay, Inc.*, 23 F.3d 110, 117 (5th Cir. 1994). On the other hand, where the Secretary was unable to produce records of prior investigations with substantially similar facts to the violations asserted, employer's violations were not willful. *Reich v. Tiller Helicopter Services, Inc.*, 8 F.3d 1018, 1036  (5th Cir. 1993). An employer is not acting willfully even if he fails to seek legal advice on his payment method or acted unreasonably in violating FLSA. *See Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1416 (5th Cir. 1990) (citing *McLaughlin v. Richland Shoe*, 486 U.S. 128) (finding that where employer discussed payment with the employment commission and consulted brochures it did not act in reckless disregard of the law).

Plaintiffs have not established that Defendants acted willfully. Defendants established that, in determining exemptions, they relied on Administaff's classification and past experience. Gregoire's understanding of the statute was that "somebody that was in charge, supervising projects, was a non-exempt employee" whereas workers under the supervision of someone else were exempt. (Gregoire Dep., Doc. No. 54, Ex. A, 60:12-60:19.) Further, a lawsuit filed in 2006

is immaterial to job classification decisions made prior to that year. Three employees, however, Nudell, Villegas, and Parsons, started in early 2006. If the violations in that litigation resemble those potentially at hand, it is possible that Defendants had knowledge that they were violating FLSA at the time they classified those three Plaintiffs. In addition, at some point in 2006 or 2007, Gregoire took a Florida Contracting Licensing in which the students likely discussed FLSA issues. (Doc. No. 54, Ex. A, 114:22-115:13; 116:19-116:22.) Consequently, depending on the date of the course, it is possible that Defendants had a better understanding of the law by that time. For all other Plaintiffs, however, Defendants' Motion will be granted and Plaintiffs' Motions denied as to the determination that Defendants' violations were not willful.

### c. Statute of Limitations

The statute of limitations governing recovery of unpaid wages provides for a two-year statute of limitations, except in the case of willful violations that have a three-year statute of limitations. 29 U.S.C. § 255. Defendants argue that Plaintiff Barlow's claim is partially barred by the statute of limitations. The Court agrees; his claim is barred for violations prior to July 5, 2005, because Defendants' violations were not willful as to him.

### 6. Calculating Overtime Wages

Plaintiffs argue that they are entitled to damages of one and one-half times their regular rate of pay for hours in excess of forty in any given week. Defendants respond that the proper method is the fluctuating workweek method ("FWW") because Plaintiffs were paid a salary for all hours worked, a fact that Plaintiffs concede. (Doc. No. 60, at 14.) Consequently, based on the evidence presented, the parties intended the salary paid to cover all hours worked. An administrative bulletin provides that a non-exempt employee may be paid on a FWW basis if there is a "clear mutual understanding of the parties that the fixed salary is compensation (apart

from overtime) for the hours worked each workweek." 29 C.F.R. § 778.114.[10] Plaintiffs respond that there is no indication that both parties agreed to this arrangement, and therefore it is inconsistent to apply this method for damages.

The FLSA requires that non-exempt employees be paid at least one and one-half times their regular rate of pay for all hours over forty worked during a particular week. 29 U.S.C. § 207(a). If an employee is misclassified as exempt from the overtime provisions, damages are the amount of the unpaid overtime compensation and an equal additional amount as liquidated damages. 29 U.S.C. § 216(b). "Unpaid overtime compensation" is not defined in the statute. In the context of firefighters seeking unpaid overtime, the Fifth Circuit recently calculated damages without relying on the FWW bulletin. The court applied the DOL regulation that defines regular hourly rate of pay as the weekly salary divided by the number of hours "which the salary is intended to compensate," by examining the parties' course of conduct under the employment contract. *See* 29 C.F.R. §§ 778.113, 778.108. The court divided the salary by the number of hours worked each week. *Singer*, 324 F.3d at 824. It found that, even though the paychecks did not adequately compensate the employees for their overtime, they were intended to compensate the employees for all of their regularly scheduled hours, including overtime. *See Singer*, 324 F.3d at 824-25. Thus, the court calculated damages by dividing each two-week paycheck amount by the total number of hours worked in the two-week period. Then it calculated overtime hours at 1.5 times the hourly rate. *See Id*. at 824-25.

---

[10] "Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week. Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement." 29 C.F.R. § 778.114.

*Singer* disagreed with the use of the fluctuating workweek method to calculate damages because the parties did not have a "clear mutual understanding" that the method applied as required by 29 C.F.R. § 778.114. *See Singer*, 324 F.3d at 825 n. 4. The Fifth Circuit, however, has calculated damages using the fluctuating workweek method, without citing binding authority, because it held that the parties "agreed on a fixed salary for varying hours," regardless of the parties' lack of mutual understanding that overtime would be paid under the FWW method. *See Blackmon v. Brookshire Grocery Co.*, 835 F.2d 1135, 1138-39 (5th Cir. 1988). Here, parties do not have a clear mutual understanding that overtime should be paid in this manner, but, because Fifth Circuit precedent is binding on this court, and *Blackmon* remains good law, the Court will apply what it believes to be an erroneous standard to the damages calculation. *See, also*, *In re: EZPawn Fair Labor Standards Act Litigation*, No. 1:07-cv-553-AWA, 2008 WL 2513682 (W.D.Tex. June 18, 2008) (holding that the FWW method is inappropriate for calculating damages and asking that the Fifth Circuit revisit its holding in *Blackmon*). Consequently, any unpaid overtime will be paid using the fluctuating workweek method, that is, unpaid overtime will be reimbursed at one-half the regular hourly rate.

### 7. **Attorney's Fees**

Defendants argue that Plaintiffs are not yet entitled to fees and, if they are, the fees claimed are not reasonable. Further, they note that Plaintiffs did not apply the *Johnson* factors to assess the reasonableness of the fees.

In FLSA cases, a court "shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant ...." *See* 29 U.S.C. § 216(b); *see also Hensley v. Eckerhart,* 461 U.S. 424, 433-34 (1983) (stating that reasonableness is the bedrock upon which the determination of the amount of attorney's fees rests). Though the

attorney's fee provision of the FLSA does not mention "prevailing party," courts typically cite prevailing party fee-shifting jurisprudence in FLSA cases. *See, e.g., Tyler v. Union Oil Co. of Calif.,* 304 F.3d 379, 404 (5th Cir. 2002). A prevailing party is one that "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley*, 461 U.S. at 433.Consequently, attorney's fees may be awarded depending on the outcome of the jury trial and whether the Plaintiffs are determined to be the prevailing parties at that time.

## VI. CONCLUSION

For the foregoing reasons, Jesse Michael Gutierrez's claims are **DISMISSED WITHOUT PREJUDICE** and his Motion for Summary Judgment is **DENIED**. (Doc. No. 44.) All of Plaintiffs' Motions and Defendants' Motion are **DENIED** as whether the Plaintiffs, except for Gutierrez, qualify for the administrative exemption or the combination exemption. (Doc. Nos. 37, 38, 40-43, 47, 48, 50.) All of Plaintiffs' Motions and Defendants' Motion are **DENIED** as whether the relevant Plaintiffs, except for Gutierrez, qualify for the executive exemption. (Doc. Nos. 37, 38, 40-43, 47, 48, 50.) Defendants' Motion is **GRANTED** as to the contention that the Motor Carrier Act exemption applies to Plaintiffs Nudell, Villegas, Parsons, and Beltz until August 10, 2006. (Doc. No. 50.) Defendants' Motion is **DENIED** as to the contention that the Motor Carrier Act exemption applies to Plaintiffs Barlow, John & Robert Beltran, and Garcia. (Doc. No. 50.) Defendants' Motion is **DENIED AS MOOT** as to the contention that the Motor Carrier Act exemption applies to Plaintiff Gutierrez. (Doc. No. 50.) Plaintiff Barlow's claims are **BARRED BY THE STATUTE OF LIMITATIONS** for any violations prior to July 5, 2005. (Doc. No. 38.) Plaintiffs' Motion to Substitute Declarations is **GRANTED**. (Doc. No. 59.)

**IT IS SO ORDERED**.

**SIGNED** this 8th day of December, 2008.

_____

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE